CONNECTICUT BUILDING WRECKING COMPANY, INC., ET AL. *v.* LESLIE CAROTHERS, COMMISSIONER OF ENVIRONMENTAL PROTECTION (14181)

SHEA, CALLAHAN, GLASS, HULL and BORDEN, Js.

Argued February 15—decision released May 7, 1991

*Gary A. Mastronardi,* for the appellants (plaintiffs).

*Janet P. Brooks,* assistant attorney general, with whom were *Robert B. Teitelman,* assistant attorney general, and, on the brief, *Clarine Nardi Riddle,* then attorney general, and *Joseph Rubin,* assistant attorney general, for the appellee (defendant).

SHEA, J. The state department of environmental protection (DEP) charged the plaintiffs with operating and depositing waste at an unpermitted solid waste disposal facility. The DEP ordered them to cease these illegal activities and to remove all solid waste exclusive of "clean fill" from the site. After seven days of hearings, the DEP hearing officer affirmed the order. In the ensuing administrative appeal, the Superior Court affirmed the hearing officer's finding of liability but refused to review the order itself, ruling that the reasonableness of the order could only be challenged in the pending enforcement proceeding. The plaintiffs appealed, challenging (1) the sufficiency of the evidence for the finding of liability, (2) the trial court's refusal to review the enforcement order itself, and (3) the constitutionality of General Statutes (Rev. to 1985) § 22a-207 (4) and (6),[1] specifically, whether the phrase "location utilized for the ultimate disposal of wastes" is an impermissibly vague definition of "solid waste disposal area." We affirm the judgment with respect to the first and third issues raised, but reverse with respect to the second.

---

[1] Between April and September, 1985, General Statutes (Rev. to 1985) § 22a-207 (4) and (6) provided: "(4) 'Solid waste facility' means any solid waste disposal area, volume reduction plant or resource recovery facility operated by any municipal or regional authority or any person if such area, plant or facility handles more than five tons a year of solid waste . . . .

"(6) 'Solid waste disposal area' means the location utilized for ultimate disposal of wastes as approved by the department."

The following facts are not in dispute. In a series of orders commencing in September, 1985, the DEP charged Connecticut Building Wrecking Company, Inc. (CBWC), and its joint owners, Geno and Russell Capozziello, who are brothers, with violations of Public Acts 1985, No. 85-334, § 2 (b) and (c).[2] Those provisions

---

[2] The DEP orders allege violations of No. 85-334, § 2 of the 1985 Public Acts, subsequently amended by No. 85-613, § 147, of the 1985 Public Acts and then codified as General Statutes (Rev. to 1987) § 22a-208 (b) and (c), later renumbered and revised as General Statutes (Rev. to 1991) § 22a-208a (b) and (c). Number 85-334, § 2 of the 1985 Public Acts was not effective until either May 22, 1985 (the date it was passed), or June 16, 1985 (the date it was signed). Public Acts 1985, No. 85-334, § 8. Number 85-613, § 147 of the 1985 Public Acts, which amended No. 85-334, § 2, was effective as of either June 5, 1985 (the date it was passed), or July 10, 1985 (the date it was signed). Public Acts 1985, No. 85-613, § 154. The hearing officer based his decision on a finding of illegal acts committed between April and September, 1985. While the plaintiffs do not address this chronological discrepancy directly, parts of their argument appear to focus upon the effective date of No. 85-334 of the 1985 Public Acts. We note, however, that the alleged violations of No. 85-334, § 2 of the 1985 Public Acts would also have violated preexisting General Statutes (Rev. to 1985) § 22a-208 (c). The substantive changes to law contained in No. 85-334, § 2, of the 1985 Public Acts are generally not relevant to the issues disputed by the plaintiffs. We need not, therefore, consider whether the changes contained in the 1985 enactments, each of which provided that it should "take effect from its passage"; Public Acts 1985, No. 85-334, § 8; Public Acts 1985, No. 85-613, § 154; were intended to be retroactive to the date of passage prior to the date those acts were approved by the governor.

The three different versions of the statute in effect during the period in question (April through September, 1985), are as follows.

In April, 1985, General Statutes (Rev. to 1985) § 22a-208 (c) provided: "No solid waste facility shall be built, established or altered after July 1, 1971, until the plan and design and method of operation of the same have been filed with the department and approved by the commissioner by the issuance of a permit, provided, nothing in this chapter or in chapter 446e shall be construed to limit the right of any local governing body to regulate, through zoning, land usage for solid waste disposal. No solid waste facility shall be operated on or after October 1, 1984, unless the owner or operator of such facility has filed a closure plan with the commissioner which he has approved as in compliance with regulatory standards adopted pursuant to section 22a-209. The commissioner shall send a written notification of any application for a permit to the chief elected official of each

essentially prohibit, inter alia, "altering" (§ 2 [b]) or "operating" (§ 2 [c]) a solid waste facility that does not

municipality in which the proposed facility is to be located within five business days of the date on which any such application is filed."

Public Acts 1985, No. 85-334, § 2, passed on May 22, 1985, and signed into law on June 16, 1985, amended General Statutes § 22a-208 by changing former subsection (c) to (b) and adding a new subsection (c), as follows: "(b) No solid waste facility shall be built or established and no solid waste facility for which a permit to construct is required shall be altered after July 1, 1971, until the plan, design and method of operation of such facility have been filed with the department and approved by the commissioner by the issuance of a permit to construct, provided, nothing in this act or chapters 446d and 446e of the general statutes shall be construed to limit the right of any local governing body to regulate, through zoning, land usage for solid waste disposal. The commissioner shall send a written notification of any application for a permit to construct to the chief elected official of each municipality in which the proposed facility is to be located, within five business days of the date on which any such application is filed.

"(c) No solid waste facility for which a permit to construct is required shall be operated on and after the effective date of this act, except for performance testing approved by the commissioner, unless such facility has been issued a permit to operate. The commissioner may issue such permit upon determination that the facility (1) will be operated in accordance with applicable laws or regulations, (2) has been constructed in accordance with a permit issued pursuant to subsection (b) of this section, and (3) has satisfactorily completed any performance tests required by the commissioner. All operating facilities holding a valid permit to construct on or before the effective date of this act shall be issued a permit to operate and shall be allowed to continue operations prior to the issuance of such permit to operate."

Section 8 of this act provides: "This act shall take effect from its passage."

New subsection (b) was further modified by a technical corrections act, Public Acts 1985, No. 85-613, § 147, passed on June 5, 1985, and signed into law on July 10, 1985: "Sec. 147. Subsection (b) of section 2 of public act 85-334 is repealed and the following is substituted in lieu thereof:

"(b) No solid waste facility shall be built or established and no solid waste facility [for which a permit to construct is required] WITHOUT A PERMIT TO CONSTRUCT shall be altered after July 1, 1971, until the plan, design and method of operation of such facility have been filed with the department and approved by the commissioner by the issuance of a permit to construct, provided, nothing in this act or chapters 446d and 446e of the general statutes shall be construed to limit the right of any local governing body to regulate, through zoning, land usage for solid waste disposal. The commissioner shall send a written notification of any application for

have a permit.[3] As a remedy, the DEP ordered the plaintiffs either to remove "all solid waste exclusive of clean fill" at the site or to close the facility after submitting acceptable plans within a prescribed timetable. The DEP made similar charges with respect to the same site against at least one other company, Bridgeport Wrecking Company (BWC), which the record reveals is owned by Thomas Capozziello, another brother of Russell and Geno. BWC did not, however, appeal the order against it. After reaching a tentative settlement with the DEP, CBWC submitted documents in connection with the required closure plans. The DEP, however, considered the documents inadequate and untimely. It insisted that the plaintiffs clear the site.

The "site" ordered cleared is a sloping piece of land running behind a row of houses on Clearview Drive and

a permit to construct to the chief elected official of each municipality in which the proposed facility is to be located, within five business days of the date on which any such application is filed."

This section also took effect at its passage. Public Acts 1985, No. 85-613, § 154.

These amended subsections, now renumbered General Statutes (Rev. to 1991) § 22a-208a (b) and (c), have remained unchanged to date.

[3] Section 2 (b) of Public Acts 1985, No. 85-334, also prohibits "constructing" or "maintaining" an unpermitted solid waste disposal facility. The hearing officer concluded that the appellants had committed these illegal acts as well as "operating" the facility "by dumping," which we construe to mean they "altered" the facility and "operated" the facility "by altering" it within the meaning of § 2 (b) of the act, i.e., by adding to the volume of waste present at the facility.

Since there is overwhelming evidence that the dump existed as a solid waste disposal facility before April, 1985, when the plaintiffs are first alleged to have engaged in their illegal activities, the officer's conclusion that the appellants "constructed" the facility is unsupported. The trial court did not specifically address the hearing officer's conclusion that the plaintiffs had "maintained" the facility. Since neither party has made arguments with respect to the plaintiffs' alleged "construction" or "maintenance," as distinct from "operation," of the facility, we will assume that the DEP has abandoned any claim that the trial court's dismissal of the appeal should be upheld on the alternative ground that there is substantial evidence that the plaintiffs "constructed" or "maintained" the facility.

Clearview Circle in Bridgeport. The DEP's "principal environmental analyst," Thomas Pregman, estimated that the dumped materials or "fill" covering the site area measured approximately 500 feet in length, 35 to 40 feet in width and 20 to 30 feet in height. The fill covered the backyards of nine different but contiguous lots of land with nine different owners. No solid waste permit of any kind was ever sought by or issued to either the plaintiffs or any of the resident owners.

Both the DEP and the plaintiffs agree that truckloads of material were dumped on the site by CBWC as well as by other companies. Some residents initially welcomed the dumping as a means of leveling the steep slope of their backyards. The plaintiffs do not dispute the presence of "solid waste" at the site, including wood, tires, stumps and leaves. The hearing officer made factual findings that "[t]he limits of the solid waste fill are unknown" and that "[t]he sources of most of this waste are undetermined."

I

Before proceeding to address the substance of the hearing officer's conclusions, we must discuss the plaintiffs' claim that the statute they are charged with violating is unconstitutionally vague.[4]

The DEP found that the plaintiffs had violated § 2 (b) and (c) of No. 85-334 of the 1985 Public Acts, subsequently modified by No. 85-661, § 147 of the 1985 Public Acts and codified as General Statutes § 22a-208a (b) and (c).[5] Under any version of the statute in effect

[4] As a general rule, we consider statutory issues before reaching constitutional questions. See, e.g., State v. DellaCamera, 166 Conn. 557, 353 A.2d 750 (1974). In this case, however, we cannot evaluate the hearing officer's conclusion that CBWC and its officers violated the statute until we have first construed the statute, because our construction of the statute is intertwined with the constitutional issue of vagueness.

[5] See footnote 2, supra. Number 85-334, § 2 and No. 85-613, § 147 of the 1985 Public Acts simply amended preexisting General Statutes § 22a-208 (c),

during the period in question, it was illegal to alter or operate a "solid waste facility" that did not have the requisite permits the statutes or regulations required. Because the plaintiffs' conduct would not violate the statute unless the "facility" at which they dumped was required to have a permit, the pertinent issue involves the statutory definition of "solid waste facility."

General Statutes (Rev. to 1985) § 22a-207 (4) defines "[s]olid waste facility" as "any solid waste disposal area . . . if such area . . . handles more than five tons a year of solid waste." Section 22a-207 (6) defines "[s]olid waste disposal area" as "the location utilized for ultimate disposal of wastes as approved by the department."[6] The plaintiffs argue that the word "loca-

which provided in pertinent part: "No solid waste facility shall be . . . altered after July 1, 1971, until the plan and design and method of operation of the same have been filed with the department [of environmental protection] and approved by the commissioner by the issuance of a permit. . . . No solid waste facility shall be operated on or after October 1, 1984, unless the owner or operator of such facility has filed a closure plan with the commissioner which he has approved as in compliance with regulatory standards adopted pursuant to section 22a-209." General Statutes (Rev. to 1985) § 22a-208 (c).

The only changes made by the subsequent 1985 public acts that are relevant to the issues before us are (1) the addition of language limiting the requirement for a "permit to alter" to: first, facilities "for which a permit to construct is required"; Public Acts 1985, No. 85-334; and second, facilities "without a permit to construct"; Public Acts 1985, No. 85-661; and (2) the substitution of a permit requirement for operation of a facility "for which a permit to construct is required on and after the effective date" of No. 85-334 for the previous closure plan approval requirement for operation of any solid waste facility "on or after October 1, 1984." General Statutes (Rev. to 1985) § 22a-208. These changes do not affect the charges against the plaintiffs except by changing the DEP's evidentiary burden for charges of illegal "operation" of a facility to include proof that the facility was one "for which a permit to construct is required" or, after July 10, 1985, one "without a permit to construct." This decision is rendered based upon the parties' apparent assumption that the DEP had to prove that the facility was a "solid waste disposal facility" for which a permit to construct was required.

[6] Neither General Statutes § 22a-207 (4) or (6) were affected by the statutory modifications enacted in 1985.

tion" makes the entire statutory scheme unconstitutionally vague on its face. They also argue that the word "location" makes the statutory scheme unconstitutionally vague when applied to the Clearview Drive site, which consists of portions of nine separately owned lots of land.

When a litigant challenges a statute as void for vagueness under the United States constitution, we confine our inquiry to the statute's applicability to the facts of the case unless the statute could intrude upon fundamental constitutional guarantees, such as first amendment rights. *State* v. *Cavallo,* 200 Conn. 664, 670, 513 A.2d 646 (1986). A statute may be unconstitutionally vague in violation of due process without impinging upon such fundamental guarantees, but in such a case, a litigant lacks standing to challenge the statute's vagueness unless his own due process rights would be violated by its application to him. Id. An exception to this general rule arises in those rare cases when the statute's vagueness itself violates due process by making the statute impossible to obey. See, e.g., *Champlin Refining Co.* v. *Corporation Commissions of Oklahoma,* 286 U.S. 210, 243, 52 S. Ct. 559, 76 L. Ed. 1062 (1932); cf. *Lanzetta* v. *New Jersey,* 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939). In order to prevent this latter difficulty, we will, if we have not previously construed the statute, "search for 'an effective and constitutional construction that reasonably accords with the legislature's underlying intent' "; *State* v. *Floyd,* 217 Conn. 73, 79, 584 A.2d 1157 (1991), quoting *State* v. *Breton,* 212 Conn. 258, 269, 562 A.2d 1060 (1989); thereby dispelling any claimed constitutional violation. See, e.g., *Ward* v. *Rock Against Racism,* 491 U.S. 781, 795–76, 109 S. Ct. 2746, 105 L. Ed. 2d 661, reh. denied, 492 U.S. 937, 110 S. Ct. 23, 106 L. Ed. 2d 636 (1989) (the United States Supreme

Court, in evaluating a facial challenge to a state law, will consider any limiting instruction proffered by a state court).

The plaintiffs contend that, as written, § 22a-207 (4) and (6) make it impossible for *any* dumper to obey General Statutes (Rev. to 1989) § 22a-208a (b) and (c). Since a dumpsite "location" is not a "solid waste disposal area" unless it "handles more than five tons a year of solid waste," the plaintiffs maintain that a dumper will be at a loss when he tries to determine whether his disposal activities in a given "area" or "location" have triggered the "five ton" permit requirement. This argument suggests that dumping one ton in each of five city neighborhoods could be dumping five tons in one "location" if the "location" is the entire city.

"The court must use common sense in construing statutes and must assume that a reasonable and rational result was intended by the promulgating legislature." *Windham First Taxing District* v. *Windham,* 208 Conn. 543, 553, 546 A.2d 226 (1988). The statute refers to an "area that handles" and a "location utilized for" solid waste. Without delimiting the full scope of the term "location"; cf. *Board of Education* v. *Freedom of Information Commission,* 217 Conn. 153, 161, 585 A.2d 82 (1991); *Cos Cob Volunteer Fire Co. No. 1, Inc.* v. *Freedom of Information Commission,* 212 Conn. 100, 106, 561 A.2d 429 (1989); we can reasonably construe § 22a-207 (6) as limited to contiguous property that is intended to or reasonably appears to act as a single dumpsite. So construed, the statutory scheme is not "impossible" to obey; the still puzzled would-be dumper may seek further clarification from the DEP, the agency responsible for administering the statute. "[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States* v. *National Dairy Corporation,*

372 U.S. 29, 32, 83 S. Ct. 594, 9 L. Ed. 2d 561 (1962), reh. denied, 372 U.S. 961, 83 S. Ct. 1011, 10 L. Ed. 2d 13 (1963). This is especially true when the statute affects regulated activity, such as dumping, for "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman Estates* v. *Flipside, Hoffman Estates,* 455 U.S. 489, 498, 102 S. Ct. 1186, 71 L. Ed. 2d 362, reh. denied, 456 U.S. 950, 102 S. Ct. 2023, 72 L. Ed. 2d 476 (1982); see also *Kolender* v. *Lawson,* 461 U.S. 352, 358 n.8, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983); *Papachristou* v. *Jacksonville,* 405 U.S. 156, 162, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972); cf. *Boyce Motor Lines, Inc.* v. *United States,* 342 U.S. 337, 72 S. Ct. 329, 96 L. Ed. 367 (1952). By contrast, the statute at issue in *Champlin Refining Co.* v. *Corporation Commissions of Oklahoma,* supra, would have required the refining company to conduct an exhaustive economic survey of its operations in order to discover whether it was operating "wastefully," even assuming that the term "wasteful" was capable of any objective meaning.

Although we conclude that § 22a-207 (6), as construed, is sufficiently clear to preserve the constitutionality of § 22a-208a (b) and (c), the plaintiffs did not have the benefit of our limiting construction at the time they are alleged to have violated the statute. They are, therefore, entitled to contend that the statute was unconstitutionally vague as applied to the facts of their case.

"A party attacking the constitutionality of a validly enacted statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt. *State* v. *Breton,* [supra]; *Zapata* v. *Burns,* 207 Conn. 496, 507–508, 542 A.2d 700 (1988)." *State* v. *Floyd,* supra, 79. The concept of unconstitutional vagueness derives from the guarantees of due process contained in the fifth and fourteenth amendments to the United States

constitution. See *Hoffman Estates* v. *Flipside, Hoffman Estates,* supra, 498–504; *Grayned* v. *Rockford,* 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Due process requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply them" in order to prevent the risk of arbitrary and discriminatory enforcement. *Grayned* v. *Rockford,* supra, 108; see also *Smith* v. *Goguen,* 415 U.S. 566, 573, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974); *United States* v. *Petrillo,* 332 U.S. 1, 7, 67 S. Ct. 1538, 91 L. Ed. 1877 (1946); *Keogh* v. *Bridgeport,* 187 Conn. 53, 60, 444 A.2d 225 (1982).[7] To demonstrate that a statute is unconstitutionally vague as applied to him, a litigant must therefore demonstrate beyond a reasonable doubt that he had inadequate notice of what was prohibited or that he was the victim of arbitrary and discriminatory enforcement. The plaintiffs can do neither.

To demonstrate his lack of notice of what was prohibited, the challenging party must establish that a person of ordinary intelligence would not be able to know whether his conduct is permitted or prohibited under the statute. *Bottone* v. *Westport,* 209 Conn. 652, 658, 553 A.2d 576 (1989). " 'The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' " *State* v. *Chetcuti,* 173 Conn. 165, 167, 377 A.2d 263 (1977), quoting *Jordan* v. *De George,* 341 U.S. 223, 231–32, 71 S. Ct. 703, 95 L. Ed. 886 (1950). The DEP's unchallenged photographic exhibits depict an enormous mountain ridge of waste spanning the nine Clearview Drive backyards without

---

[7] A vague statute that creates a risk of arbitrary or discriminatory enforcement might be unconstitutional, alternatively, as an impermissible delegation of legislative authority. Cf. *Bottone* v. *Westport,* 209 Conn. 652, 667–68 n.14, 553 A.2d 576 (1989).

visible demarcations of any kind.[8] No reasonable person could view such a scene, as the plaintiffs admittedly did, and perceive nine separate dumpsites. The ordinary person could not fail to realize that dumping in any one or more of the nine backyards would constitute dumping in a single "location."[9]

To demonstrate that the statute's vagueness gives an agency unbridled discretion to enforce the statute arbitrarily and discriminatorily, the challenging party must establish that he was the victim of such arbitrary and discriminatory enforcement. See *State* v. *White,* 204 Conn. 410, 417, 528 A.2d 811 (1987); cf. *Hoffman Estates* v. *Flipside, Hoffman Estates,* supra, 503. The final hearing officer specifically concluded that the plaintiffs "[had] not alleged any facts to support a finding of invidious prosecution." The plaintiffs have not contested that conclusion on appeal and cannot now be heard to claim that the statute sanctioned arbitrary enforcement against them. *State* v. *White,* supra.

___

[8] The photographic exhibits were taken on August 20, 1985 (Exhibits 7A, 7B, 8A, 8B), and October 4, 1985 (Exhibits 9A–F, 10). Thus, some were taken after the period of time during which the appellants were alleged to have committed their illegal acts. The appellants have not claimed that the photographs misrepresent the general condition of the site at the time they did their dumping. In addition, the individual appellants themselves testified that when they began dumping the entire site area was "just about . . . filled in."

[9] The plaintiffs point out that we recently affirmed a trial referee's decision setting aside a contempt citation issued against Thomas Capozziello, president of BWC, for continuing solid waste disposal on property he owned that adjoined another property he merely leased. *Carothers* v. *Capozziello,* 215 Conn. 82, 107–10, 574 A.2d 1268 (1990). In that context, however, we had no occasion to construe the statutory definition of "location" contained in General Statutes § 22a-207 (6), but addressed ourselves to the terms of the preliminary injunction at issue as compared to the location of the alleged illegal conduct. Because the order upon which the injunction was based claimed violations at the leased site but not at the owned site, we held that the trial court's interpretation of the scope of the injunction was unduly expansive.

## II

The plaintiffs next claim that the DEP's orders should be reversed as "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." General Statutes § 4-183 (j) (5).

"The 'substantial evidence' rule governs judicial review of administrative factfinding under General Statutes (Rev. to 1987) § 4-183 (g). . . . An administrative finding is supported by 'substantial evidence' if the record affords a ' " 'substantial basis of fact from which the fact in issue can be reasonably inferred.' " ' . . . Such a standard of review allows less room for judicial scrutiny than does the 'weight of the evidence' rule or the 'clearly erroneous' rule. . . . In determining whether an administrative finding is supported by 'substantial evidence,' a court must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part. . . . An agency composed of [experts] is entitled, furthermore, to rely on its own expertise within the area of its professional competence. . . . Basically, an agency is not 'required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair.' " (Citations omitted.) *Briggs* v. *State Employees Retirement Commission,* 210 Conn. 214, 217–18, 554 A.2d 229 (1989); see also *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* 216 Conn. 627, 639–40, 583 A.2d 906 (1990).

The plaintiffs contend that "under Connecticut law, in order to operate a 'solid waste disposal area,' a person must (1) utilize a location; (2) for ultimate disposal of solid waste; (3) at the rate of at least five tons per year." They further contend that "solid waste" is waste

exclusive of "clean fill" as defined by administrative regulations, so that in order to meet its burden of proof, the DEP had to prove that they dumped more than five tons per year of waste exclusive of clean fill. They maintain, in conclusion, that the DEP failed to satisfy this burden. The plaintiffs' contentions are completely without merit, however, because they fundamentally misconstrue both the statute and the regulations.

The plaintiffs were charged with violations of § 2 (b) and (c) of No. 85-334 of the 1985 Public Acts, formerly General Statutes (Rev. to 1985) § 22a-208 (c), subsequently General Statutes (Rev. to 1987) § 22a-208a (b) and (c). Under any version of the statute, the plaintiffs would be liable for its violation if they *either* altered, e.g., by adding to,[10] a preexisting solid waste facility that did not itself have a construction permit (subsection [b] of the statute), *or* if they "operated" a solid waste facility without a permit to do so (subsection [c] of the statute).[11]

The DEP could have demonstrated the plaintiffs' liability even if the plaintiffs had not themselves dumped a single ounce of anything, solid waste or otherwise, at the dump, if it were able to show that the plaintiffs had "operated" the dump, e.g., if they had managed it, supervised dumping by other companies, controlled the contours of the site by spreading the waste and directing the location of new loads, or performed other

---

[10] The Regulations of Connecticut State Agencies, § 22a-209-1 provides the following definition of the statutory term "alter":

" 'Alter' (1) when referring to a solid waste facility which has no permit, means to change the existing configuration or method of operation of the facility in any manner, including but not limited to adding to the volume of solid waste deposited at the facility; (2) when referring to a solid waste facility which holds a permit, means to change the approved configuration or method of operation of the facility in any manner, including but not limited to adding to the approved volume of solid waste deposited at the facility."

[11] See footnote 3, supra.

acts that the administrative regulations require "certified" operators of solid waste facilities to perform.[12] The final hearing officer's findings with respect to the individual liability of Geno and Russell Capozziello[13] have significant support in the administrative record and might have supported an ultimate conclusion that CBWC was also liable as such an "operator" of the facility. Instead, however, the final hearing officer assessed CBWC's liability based on his finding that the plaintiffs had "operated" the site in question "by dumping." For this reason alone, we shall proceed to evaluate the substantiality of the evidence in support of the hearing officer's finding that the plaintiffs "operated" a solid waste facility "by dumping."

## A

As the plaintiffs point out, the first question is whether the DEP proved that the facility was a "solid waste facility." We have already construed § 22a-207 (6) to define a "solid waste disposal area" as including a location consisting of contiguous property that is intended to or reasonably appears to act as a single dumpsite "utilized for ultimate disposal of wastes,"[14] and have concluded that the Clearview Drive

---

[12] See Regs., Conn. State Agencies §§ 22a-209-6, 22a-209-7. The Regulations of the Connecticut State Agencies, § 22a-209-1 defines "operator" as "a person who is ultimately responsible for maintaining the solid waste facility in conformance with applicable statutes and regulations and the facility permits." This definition is unhelpful when one is charged with "operating" a facility that does *not* have a permit.

[13] The appellants have not contested the hearing officer's findings imposing liability upon the Capozziello brothers as individuals for their personal participation in "operating" the facility. By virtue of such participation, we affirm the trial court's judgment against Russell and Geno Capozziello in their individual capacities with respect to liability. Part III of this opinion, however, also applies to the DEP orders issued against them as individuals.

[14] The full text of General Statutes § 22a-207 (6) defines "[s]olid waste disposal area" as "the location utilized for ultimate disposal of wastes as approved by the department." The phrase "as approved by the department"

dumpsite was such an "area." To prove that the Clearview Drive dumpsite was a "solid waste disposal *facility*," the DEP still had to prove, however, that the site "handled more than five tons a year of solid waste."

Section 22a-207 (3) defines "solid waste" as "unwanted or discarded materials, including solid, liquid, semisolid or contained gaseous material." The plaintiffs do not dispute the presence at the site of discarded "solid material," nor, indeed, that they dumped such "solid material" at the site.[15] Instead, they assert that the hearing officer's decision was not based on substantial evidence because the DEP did not prove the presence of more than five tons of materials *other than* "clean fill," which, they assert in a footnote, "is not, by definition, 'solid waste.' "

---

presumably ensures that dumping outside the authorized boundaries of a permitted solid waste facility will constitute unpermitted dumping. In this case, of course, because there was no permit, there was no location "approved by the department."

[15] The plaintiffs argued to the trial court that the materials deposited at the site were not "unwanted or discarded" because the residents had authorized the dumping as a means of leveling off their sloping backyards. They have not, however, appealed the trial court's conclusion that "at the time an outside party contracts with a demolition company, the debris resulting from the demolition of the building or site, becomes unwanted and falls within the statutory definition of *solid waste*; the debris is 'discarded' or 'unwanted' by the person or party who contracted to have the particular structure demolished" and therefore that "the demolition debris deposited at Clearview [Drive] constituted solid waste as defined by General Statutes Section 22a-207 (3)." (Emphasis in original.) In the words of the trial court: "Simply because other parties, thereafter, may wish to obtain the debris from the demolition company, by purchase or otherwise, does not remove it from the Section 22a-207 (3) definition; to so construe the statute, in the circumstances of this case, would be to ignore the expressed objective of protecting the environment and the public from unsafe commercial operations presenting risks of fire, odor, air pollution, water pollution, etc." Our discussion of the words "discarded" or "unwanted" in *Carothers* v. *Capozziello*, 215 Conn. 82, 107–10, 574 A.2d 1268 (1990), was in the context of alleged violations of General Statutes § 22a-250 (c), the littering statute, and does not affect this case.

The plaintiffs are incorrect. The statutes do not mention "clean fill," and the only statutory definition of "solid waste" is the broad definition, cited above, in § 22a-207 (3). The DEP regulations promulgated pursuant to General Statutes § 22a-209 do not provide any definition of "solid waste," much less a narrow definition of "solid waste" excluding "clean fill," and, indeed, such a contradictory regulation might exceed the commissioner's statutory authority. See General Statutes (Rev. to 1985) § 22a-209.[16]

The DEP regulations do address "clean fill," but not in the sense asserted by the plaintiffs. Section 22a-209-1 of the Regulations of Connecticut State Agencies first defines "clean fill" as "natural soil, rock, brick, ceramics, concrete, and asphalt paving fragments which are virtually inert and pose neither a pollution threat to ground or surface waters nor a fire hazard." Next, § 22a-209-3 of the Regulations of Connecticut State Agencies provides: "These regulations apply to the operation and management of all existing and proposed solid waste facilities, and to all applications for a permit or contract approval which are submitted after or are in process on the effective date of these regulations. Areas which are *solely* for the disposal of clean fill shall be exempt from the provisions of these regulations." (Emphasis added.) By implication, areas for the disposal

---

[16] "[General Statutes (Rev. to 1985)] Sec. 22a-209. REGULATIONS. The commissioner shall promulgate regulations governing solid waste management, and permits, as provided for in subsection (c) of section 22a-208, shall be conditioned upon conformance with such regulations as well as applicable laws." This statute, formerly enacted as General Statutes § 19-524c, was operative in February, 1985, when the discussed regulations became effective.

We note that, had the regulations validly exempted "clean fill" from the definition of solid waste, the burden would remain on the plaintiffs to prove that the materials they dumped fell within the exemption. See *Conservation Commission* v. *Price,* 193 Conn. 414, 424, 479 A.2d 187 (1984); 2 A J. Sutherland, Statutory Construction (4th Ed. Sands) § 47.22.

of solid wastes that include both clean fill and other wastes are not exempt from the regulatory requirements.

The prohibition on combined dumping is made clear by the only other regulation using the term "clean fill," § 22a-209-1. That section defines "bulky waste" as "landclearing debris and waste resulting directly from demolition activities other than clean fill" and then includes "bulky waste" within the definition of "special wastes" or "non-hazardous solid wastes which require special handling . . . ." Next, § 22a-209-8 (c) of the Regulations of Connecticut State Agencies provides: "The combined disposal of special wastes with other solid wastes or special wastes is prohibited unless specifically approved in writing by the Commissioner." Thus, "bulky waste" and "clean fill" may not be disposed of together without special approval by the commissioner.

` These regulations make it clear that "clean fill" *is* solid waste within the statute. The question is not whether there were five tons of waste exclusive of clean fill where the plaintiffs dumped; the question is whether there were five tons of *any* solid waste at that site, so long as clean fill was not the only waste at the site. If the unpermitted site contained more than five tons of solid waste, deposited within one year, the statutes and regulations made it illegal for the plaintiffs to "operate" or "alter" the site by adding anything, even less than five tons, to the site.

The facts of this case illustrate the legislative purpose behind imposing cleanup liability on even those who engage in merely negligent dumping of otherwise innocuous materials. Decomposition of solid waste other than clean fill creates demonstrated environmental hazards. If decomposable solid waste and clean fill are combined, it becomes difficult to discover the cul-

prit and assign liability. Presumably for that reason, the regulations prohibit combination dumps without permission; requiring DEP permission enables the DEP to exercise some oversight. Once a combination dump has been created without DEP oversight, additional deposits of any material, including clean fill, make it more difficult to remove the decomposing materials and, if necessary, clean up the entire combination dump, as well as further complicating discovery of the persons responsible.

## B

The plaintiffs have never claimed that the whole nine backyard site consisted entirely of clean fill. If, then, the dumpsite contained more than five tons of solid waste deposited during one year, irrespective of the quantity of clean fill within that waste, the plaintiffs have violated General Statutes § 22a-208a (b).

It would have been reasonable for the hearing officer to have inferred from the dimensions of the fill, the testimony concerning its contents; e.g., truckloads of leaves, the debris from a bedding store destroyed by fire, the rubble of a demolished housing project, all deposited during 1985; as well as from his own on-site inspection of the dump, that the fill as a whole contained five tons of solid waste deposited within one year. The hearing officer, however, apparently based his conclusion that the plaintiffs "operated" the facility "by dumping" at the site solely upon the unnecessary factual finding that *they* had dumped at least five tons of solid waste at the site during the period from April to October, 1985, without deciding, as indeed he had no need to do, what proportion of that solid waste was clean fill. The plaintiffs can prevail, therefore, only if this finding is without substantial support in the record as a whole.

The five ton requirement was first raised in passing during the plaintiffs' cross-examination of the DEP's expert, Thomas Pregman, a senior environmental analyst with eleven years of experience in solid waste management. Responding to a request that he appraise the relative condition of various portions of the site, Pregman answered: "We consider the whole—all the property as the one site." He continued, "Anything in excess of five tons of waste on all of the property is a violation." Upon the hearing officer's inquiry, Pregman commented, "I think it's—you have—basically one good size truckload is five tons."

The hearing officer cited certain evidence in support of his inference that the dumpsite contained at least five tons of solid waste: (1) the size of the dumpsite (500 feet in length, 35 to 40 feet in width, and 20 to 30 feet in height); (2) the statements of numerous resident witnesses that they had viewed the plaintiffs' "trucks" dump at the site; and (3) Pregman's statement that "one good size truckload" weighed five tons.

The plaintiffs attack the first item of evidence by arguing that the "site" at which they dumped consisted of only one or two individual backyards, not the whole nine backyard dumpsite. We have already rejected that argument. In their remaining challenge to the sufficiency of the evidence, the plaintiffs claim that the residents' testimony and Pregman's casual assertion that "one good size truckload is five tons" were too imprecise and unreliable to constitute "substantial evidence" that the five ton requirement had been met, without a further description of the size of a "good . . . truckload" or evidence that the trucks viewed by the witnesses would meet that description.

The Uniform Administrative Procedure Act (UAPA) prescribes that review of an administrative adjudicative decision should be "on the *whole* record." (Emphasis

added.) General Statutes § 4-183 (j). " 'Substantial evidence' exists if the administrative record affords ' " 'a substantial basis of fact from which the fact in issue can be reasonably inferred.' " ' " (Citations omitted.) *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* supra, 639–40. If, therefore, the specific evidence cited in support of an administrative officer's ultimate factual finding is inadequate to support that ultimate factual conclusion, a reviewing court should search the record of the entire proceedings to determine whether it does in fact contain substantial evidence from which the ultimate factual finding could reasonably be inferred. *Norwich* v. *Norwich Fire Fighters,* 173 Conn. 210, 214, 377 A.2d 290 (1977); see also *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* supra; *Grillo* v. *Zoning Board of Appeals,* 206 Conn. 362, 369, 537 A.2d 1030 (1988); *Persico* v. *Maher,* 191 Conn. 384, 409, 465 A.2d 308 (1983); *Ward* v. *Zoning Board of Appeals,* 153 Conn. 141, 144, 215 A.2d 104 (1965). Thus, if the administrative record provides substantial evidence upon which the hearing officer could reasonably have based his finding that the plaintiffs dumped at least five tons at the site within one year, the decision must be upheld.

The most useful additional evidence contained in the record comes from the individual plaintiffs themselves. Testifying in his own behalf, Russell Capozziello described CBWC's activities. Asked how he reached the property of Joseph Eppes, a portion of the site CBWC admitted using as a dump, Russell stated: "We would come down Clearview Drive with our *trucks.*" (Emphasis added.) He recollected that he said to Eppes: " 'Is it possible that I could fit my company's *big trailers* between your house and the next house and use your driveway?' " (Emphasis added.) He described how he finally got his "trailer" to Eppes' property.

Russell went on to say that he had used "tractor/trailer dump trucks" to dump behind Eppes' house. Each tractor/trailer, he explained, held twenty cubic yards, and his company had dumped forty-five loads of that size.[17] The loads were generated from "[v]arious demolition jobs within the city of Bridgeport," where CBWC had been hired to demolish buildings. He claimed that CBWC dumped on and off for only three weeks, although on cross-examination it was shown that the Bedding Shack, which CBWC dumped at the site, was demolished in June, 1985, whereas CBWC first reached dumping agreements with two residents in April, 1985.

Further describing his trucks' capacity, Russell explained that demolition of the Bedding Shack, a concrete building, generated twenty to twenty-five cubic yards of demolition debris; because of the weight of the debris, it was carried in five or six loads. That building was a "very small building." As a general rule, he explained, a one-story, forty by seventy foot block building and a two-story wood frame building each gener-

[17] We note that common building brick weighs approximately 120 pounds per cubic feet, or 3240 pounds per cubic yard. R. Perry, Engineering Manual (3d Ed.) p. 4-2; G. Brady & H. Clauser, Materials Handbook (11th Ed.) p. 111. One twenty-yard truckload of building bricks would therefore weigh 64,800 pounds, or 32 tons. As Russell Capozziello explained, twenty yards of such heavy materials would be carried in several loads because of its weight. Even if a brick house producing twenty cubic yards of brick was transported in six loads, each load would be 5 tons. Light concrete block weighs less, only 65 pounds per cubic foot, or 1755 pounds per cubic yard. R. Perry, supra. If, as Russell indicated, one concrete building that the plaintiffs dumped at the site had produced twenty cubic yards of this material, that debris alone would have weighed 35,100 pounds, or 17.6 tons. Uncompressed pine boards weigh only 26 pounds per cubic foot, or 702 pounds per cubic yard. Id. A twenty yard load of pine would therefore weigh 14,040, or 7 tons. Even if we assume that none of the plaintiffs' trucks were ever full, and that the weights approximated above refer to a compact solid block of each material rather than a loose load of demolition debris, it is plain that forty-five loads of any of these materials would far exceed the five ton requirement.

ate approximately twenty cubic yards of demolition debris. "One truck," he testified, holds twenty cubic yards, although a solid load like concrete might require more truckloads.

On redirect, Russell testified concerning seventeen different buildings demolished by CBWC within the relevant time period. He was able to remember the volume of demolition debris generated in each case, but could not remember where it had been dumped. Total fill generated by these demolition jobs was approximately four hundred cubic yards.

The demolition permits entered into evidence stated that the debris was to be taken to legitimate local landfills, especially the D'Addario landfill in Milford. The DEP then offered the business records of that landfill which showed essentially no entries for dumping tickets purchased during the time the seventeen buildings were demolished. The ticket-seller, William Haug, also explained that in his record keeping, he referred to ten wheeler trucks as "fifteen yards" and trailers as "thirty yards." According to him, a trailer held thirty cubic yards of material. CBWC recalled Russell to the stand, and he then justified the discrepancy in evidence by explaining that he often got access to the D'Addario dumps without tickets because he knew the owner. He could not, however, recall the dates of any such occasions.

This damaging testimony came from the plaintiffs themselves. DEP witnesses, including Clearview Drive residents, gave additional testimony that was fiercely denied by the plaintiffs, who insisted that their accusers were either "lying" or confusing them with their allegedly "look-alike" brothers, Thomas, owner of BWC, and Dennis, owner of New England Demolition. In its memorandum of decision, the trial court recited the residents' testimony at length. Of particular note

are statements by John Karmolinsky that he saw "a number of trucks" owned by CBWC dumping rotted leaves; statements by Elbert Barnes that he saw CBWC dump "the Bedding Shack," and "leaves, scrub," and both brick and wood houses that had been demolished; and statements by Eppes that, on his property, "they" dumped "Beardsley Terrace" (a demolished housing project or apartment building), "[o]n Mr. Barnes' yard," they dumped "a load of wood and leaves and steel bars and things," and on the property of "George [Bottone] and Eddie [Fay]" (two contiguous lot owners), "wood and leaves and a refrigerator."

The DEP also offered testimony by Lawrence Morgan, a police officer called to the site by Manuel Rocha who had returned from vacation to find his yard filled with wood and other debris. Morgan testified that he saw "very large dump trucks, not the square type, but the elongated type dump trucks" exiting from Clearview Drive, and that a driver of one truck told him he worked for CBWC and Russell Capozziello.

In summary, Russell admitted that CBWC had dumped forty-five twenty cubic yard loads on the dumpsite for a total of 900 cubic yards. According to his own testimony, this deposit was the equivalent of forty-five two-story wood frame houses. The DEP's evidence indicated that at least seventeen houses were probably included in those forty-five loads. This court may not consider facts not in evidence, but neither is it required to suspend all common sense. We conclude that the hearing officer's finding, that the plaintiffs dumped at least five tons of solid waste at the site, was reasonably inferred from the testimony and other evidence adduced.[18]

---

[18] The legislature's recent amendment to General Statutes (Rev. to 1991) § 22a-207 (6), while irrelevant to the disposition of this case, is illuminating. As presently worded, the new definition of "[s]olid waste disposal area" is the "land and appurtenances thereon and structures, including a landfill or other land disposal site, used for the disposal of more than *ten cubic*

## III

Having concluded that the hearing officer's assessment of liability against the plaintiffs was reasonable, the trial court then declined to review the reasonableness of the agency's order requiring the plaintiffs to clear all solid waste exclusive of clean fill from the site. It concluded that the order's "reasonableness" was merely a predicate for its enforceability, and should be reviewed in the context of an enforcement proceeding brought by the DEP if the plaintiffs did not comply with the order. We disagree.

### A

Under the UAPA, a court "shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative . . . *decisions* are . . . arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (Emphasis added.) General Statutes § 4-183 (j). The administrative decision in this case included a "final order" that the "[r]espondents shall remove all solid waste, except clean fill," from "the site" and that the "[r]espondents shall restore the site to the conditions that existed before solid waste was disposed there." By affirming the administrative decision without evaluating the cleanup order contained within it, the trial court failed to complete the judicial review required by § 4-183 (j). We therefore remand the case to the trial court for review of the cleanup order itself.

### B

On remand, the trial court must conduct its own review of the cleanup order. In the interests of judi-

---

*yards* of solid waste." (Emphasis added.) Under the revised statute, then, the appellants' dumping would have exceeded the statutory minimum ninety times over.

cial economy, however, we will discuss the pertinent factors that the trial court should apply in evaluating the order.

In their petition to the trial court, the plaintiffs contended that the cleanup order exceeded the agency's authority and that it constituted an abuse of discretion because the DEP did not join other allegedly indispensable parties, namely, the other persons who dumped at the site. In essence, the plaintiffs claim that the order was an "abuse of discretion" because it was unreasonable for the DEP to require them to remove all the waste at the site when the DEP did not dispute that others had also dumped waste at the site, especially after the DEP hearing officer had denied the plaintiffs' request to have other dumpers "joined" in the administrative proceeding.

The DEP contends, citing General Statutes § 22a-6a (b),[19] that once a violation of the statute had been established, the plaintiffs were jointly and severally responsible for cleanup of the entire site, although entitled to seek contribution on their own behalf from others also responsible. We note that § 22a-6a (b) appears to be addressed to suits for damages brought by the commissioner, not to the propriety of remedial orders issued by the commissioner.[20] Because § 22a-6a

---

[19] General Statutes § 22a-6a (b) provides in pertinent part: "Whenever two or more persons knowingly or negligently violate any provision of section . . . 22a-208, 22a-208a . . . or any regulation, order or permit adopted or issued thereunder by the commissioner and responsibility for the damage caused thereby is not reasonably apportionable, such persons shall, subject to a right of equal contribution, be jointly and severally liable under this section." Public Acts in 1986, 1987, 1989 and 1990 made technical changes and added references to other statutory sections but in all other respects the statute is the same as that in effect in 1985.

[20] General Statutes § 22a-6a was enacted as § 1 of No. 73-665 of the 1973 Public Acts. Senator Philip N. Costello, Jr., sponsor of the original bill, substitute senate bill No. 1973, selectively summarized the section: "It provides that any person who violates any statute, regulation, order or permit administered, adopted or issued by the Commissioner of Environmental

was enacted *after* the 1971 environmental legislation which included the Solid Waste Management Act, General Statutes §§ 22a-207 through 22a-256ee, in order to *strengthen* the commissioner's enforcement powers; see, e.g., remarks of Senator Philip N. Costello, Jr., 16 S. Proc., Pt. 8, 1973 Sess., p. 3543; remarks of Representative Richard H. Wagner, 16 H.R. Proc., Pt. 15, 1973 Sess., pp. 7780–81; testimony of Daniel Lufkin, commissioner of environmental protection, concerning the bill's drafting, Conn. Joint Standing Committee Hearings, Environment, Pt. 1, 1973 Sess., pp. 264–67; we conclude, however, that the legislature did not intend by its enactment to preclude application of the common law principle of joint and several liability in the context of remedial orders.

In the related field of hazardous waste legislation, the federal courts have consistently applied the common law principle of joint and several liability, with some limitations, as expressed in the Restatement (Second) of Torts, §§ 433A, 433B, 879 and 881, to factual scenarios comparable to the one before us. See, e.g., *O'Neil* v. *Picillo,* 883 F.2d 176 (1st Cir. 1989), cert. denied sub nom. *American Cyanamid Co.* v. *O'Neil,* 493 U.S. 1071, 110 S. Ct. 1115, 107 L. Ed. 2d 1022 (1990); *United States* v. *A & F Materials Co.,* 578 F. Sup. 1249, 1255 (S.D. Ill. 1984); see also, applying a different adaptation of the Restatement principles, *United States* v. *Western Processing Co.,* 734 F. Sup. 930 (W.D. Wa. 1990); *United States* v. *Stringfellow,* 661 F. Sup. 1053

---

Protection shall be liable to the state for damages to the environment caused by such violation." 16 S. Proc., Pt. 8, 1973 Sess., p. 3541. Similarly, Representative Richard H. Wagner, offering the act to the House of Representatives, summarized: "[T]his rather lengthy bill accomplishes two fundamental purposes within the Department of Environmental Protection. It makes any person who violates any statute, regulation, order or permit administered, adopted or issued by the Commissioner be liable to the State for the damages to the environment caused by his violation. . . ." 16 H.R. Proc., Pt. 15, 1973 Sess., p. 7780.

(C.D. Cal. 1987). Although the federal hazardous waste statutes at issue in those cases; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 through 6987; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 through 9662; are substantially different from our own Solid Waste Management Act, the problems of detecting causation and assigning responsibility are present in their application as they are in ours. We are persuaded, therefore, that judicial review of any environmental cleanup order should be conducted with reference to the principles of joint and several liability, as limited by the doctrine of apportionment, expressed in those Restatement sections.

Section 433B of the Restatement (Second) of Torts provides: "Burden of Proof. (1) *Except as stated in Subsections (2) and (3),* the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff. (2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each actor. (3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm."[21] (Emphasis added.) Section 433A of the Restatement provides: "Apportionment of Harm to Causes. (1) Damages for harm are to be apportioned

---

[21] In *Gutowski* v. *New Britain,* 165 Conn. 50, 55, 327 A.2d 552 (1973), we adopted, in part, § 433B of the Restatement (Second) of Torts, with respect to intentionally tortious acts performed in concert. More recently, the Appellate Court has interpreted *Gutowski* to permit application of the doctrine to situations where each tortfeasor acts independently, but concurrently, to produce a single injury, liability for which may, nonetheless,

among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm. (2) Damages for any other harm cannot be apportioned among two or more causes."

As part of its review of the DEP cleanup order in this case, the trial court should determine whether the agency ever addressed the issue of combined or alternative causes for the environmental harm caused and made the requisite findings necessary for imposing upon the plaintiffs responsibility for cleaning up the waste deposited by other dumpers. Only in the event that there is no reasonable basis for apportionment of the damages caused to the environment among those whose illegal activities have contributed to such harm would joint and several liability be appropriate. 2 Restatement (Second), Torts § 433A. If the record on these issues is inadequate, the proper course for the trial court would be to remand the matter for further proceedings on those issues. General Statutes § 4-183 (j); see, e.g., *Harrison* v. *Commissioner*, 204 Conn. 672, 679, 529 A.2d 188 (1987); *Department of Health Services* v. *Commission on Human Rights & Opportunities*, 198 Conn. 479, 488, 503 A.2d 1151 (1986); *Feinson* v. *Conservation Commission*, 180 Conn. 421, 429–30, 429 A.2d 910 (1980).

If, after applying these considerations, the trial court finds that the scope of the cleanup order issued to the plaintiffs constituted an abuse of agency discretion, it should vacate that portion of the order requiring the

---

be apportioned on some reasonable basis. *Reilly* v. *DiBianco,* 6 Conn. App. 556, 567–72, 507 A.2d 106, cert. denied, 200 Conn. 804, 510 A.2d 193 (1986). Our decision today merely applies the doctrines contained in §§ 433A and 433B, which do not require concerted action; cf. *Kelley* v. *Thomason Solvent Co.,* 714 F. Sup. 1439, 1448 (W.D. Mich. 1989); see also 2 Restatement (Second), Torts § 439; to guide judicial review of administrative orders issued to remedy violations of our Environmental Protection Act.

plaintiffs to clear the site and remand the matter to the administrative agency for either a modification of the order with or without additional hearings, or, if the agency so chooses, dismissal of the order.

Although we affirm the judgment with respect to the issue of liability, we reverse the portion of the judgment in which the trial court declined to review the DEP remedial orders and we remand the case to the trial court for further proceedings consistent with this opinion.

In this opinion the other justices concurred.