NELSECO NAVIGATION COMPANY ET AL. *v.*
DEPARTMENT OF LIQUOR CONTROL
(10121)

DUPONT, C. J., O'CONNELL and LAVERY, Js.

Submitted on briefs October 26, 1993—decision released May 17, 1994

*Richard E. Gruskin* filed a brief for the appellants (plaintiffs).

*Richard Blumenthal,* attorney general, and *Martin Rosenfeld* and *Robert Vacchelli,* assistant attorneys general, filed a brief for the appellee (defendant).

O'CONNELL, J. This matter is now before us on remand from the Supreme Court. Previously, in *Nelseco Navigation Co.* v. *Dept. of Liquor Control,* 27 Conn. App. 614, 608 A.2d 707 (1992), we concluded that the defendant department of liquor control did not have jurisdiction over a private party on premises covered by a liquor permit when there was no sale or delivery of liquor by the permittee or its agent. The Supreme Court granted certification, reversed our judgment and remanded the case to this court for consideration of other issues raised by the plaintiffs.[1] *Nelseco Navigation Co.* v. *Dept. of Liquor Control,* 226 Conn. 418, 627 A.2d 939 (1993).

The facts are set forth in full in our prior decision and a detailed repetition here would serve no useful purpose. A brief summary is sufficient for this appeal. The defendant suspended the plaintiffs' boat liquor permit because it found that the plaintiff had permitted intoxicated persons to loiter on the premises and had permitted "a disturbance, brawl, unnecessary noises

[1] These issues are (1) whether the defendant acted arbitrarily in suspending the plaintiffs' liquor permit after finding that the plaintiffs had violated § 30-6-A24 (a) and (c) of the Regulations of Connecticut State Agencies and (2) whether the plaintiffs' due process rights were violated because of the vagueness of the foregoing regulations.

and unlawful conduct upon the permit premises and permitted it to be conducted in such a manner as to constitute a nuisance." The charges arose out of a private charter of the plaintiffs' ship, the Anna C., for a rock concert, during the course of which the unlawful conduct was found to have taken place. The plaintiffs appealed the defendant's decision to suspend the plaintiffs' boat liquor permit to the Superior Court, which affirmed the defendant's decision and dismissed the appeal.

I

We commence by noting the standard of review applicable to this case. The plaintiff brought this administrative appeal to the trial court pursuant to General Statutes § 4-183 (a).[2] In reviewing an administrative decision, it is not the function of the trial court to retry the case. The court is forbidden by statute from substituting its judgment for that of the agency as to the weight of the evidence on questions of fact. General Statutes § 4-183 (j). The question before the trial court is not whether it would have reached the same conclusions but whether the record before the agency supports the action taken. *Altholtz* v. *Dental Commission,* 4 Conn. App. 307, 310, 493 A.2d 917 (1985).

"The substantial evidence rule governs judicial review of administrative factfinding under . . . § 4-183 (g). . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . Such a standard of review allows less room for judicial scrutiny than does the weight of the evidence rule or the clearly erroneous rule. . . . In

---

[2] General Statutes § 4-183 (a) provides in pertinent part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. . . ."

determining whether an administrative finding is supported by substantial evidence, a court must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness . . . ." (Internal quotation marks omitted.) *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 593, 590 A.2d 447 (1991).

"When reviewing the trial court's decision, we seek to determine whether it comports with the Uniform Administrative Procedure Act. . . . We look to see if the [trial] court reviewing the administrative agency acted unreasonably, illegally, or in abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Vicino* v. *Zoning Board of Appeals,* 28 Conn. App. 500, 506–507, 611 A.2d 444 (1992). The trial court's decision must be affirmed unless we find that substantial rights of the plaintiffs have been prejudiced because the administrative findings, inferences, conclusions or decisions are, inter alia, clearly erroneous in view of the reliable, probative and substantial evidence in the whole record. General Statutes § 4-183 (j) (5). We conclude that the trial court, in affirming the defendant's decision and dismissing the appeal, improperly determined that there was reliable, probative, or substantial evidence on the record to support the defendant's decision.

## II

We turn first to the two charges of permitting intoxicated persons to loiter on the permit premises. Words are to be construed according to their commonly approved usage. General Statutes § 1-1 (a). "The word loitering is in common use. Webster defines [loiter]: to be slow in moving; to delay; to linger; to be dilatory; to spend time idly; to saunter; to lag behind." (Internal quotation marks omitted.) *State* v. *Tobin,* 90 Conn. 58, 62, 96 A. 312 (1915).

The first charge of loitering involved an unconscious young female who was taken to a hospital by paramedics.[3] Assuming arguendo that the young woman really was intoxicated, we are unable to conclude that the failure of an unconscious person to move constitutes loitering. Accordingly, there was no evidence to support the defendant's conclusion with respect to that loitering charge.

In connection with the second charge of permitting intoxicated persons to loiter on the premises, we ask: where were they to be ordered to go? We commence our analysis by noting that the permit premises was a ship at sea. It was not a neighborhood bar from which offenders could easily be ejected. In this situation, the equivalent of immediate ejection from the premises would be dropping the miscreants overboard. This modern version of forcing the offenders to walk the plank is obviously more bizarre than even the staunchest supporters of strict liquor law enforcement could ask.

The record discloses that the two most disruptive and intoxicated individuals were locked in the men's room and the ship's captain immediately turned the ship around and brought it back into port in order that they might be turned over to the police. *Nelseco* v. *Dept. of Liquor Control,* supra, 27 Conn. App. 617. In port, the local (New London) police were invited aboard and, despite observing the passengers in varying degrees of sobriety, made no arrests other than the two serious offenders.

---

[3] The evidence showed that the unconscious female had one drink at most while on the ship and remained hospitalized for at least three days. In its findings, the defendant stated that the female's condition was such that the police were unable to get a statement from her until "several days" after the incident. We may infer from her prolonged hospital stay that she was unconscious from causes other than intoxication. The defendant did not introduce hospital records to support its claim that she was intoxicated when she was taken off the ship.

Furthermore, although the word loiter generally has a pejorative connotation, we must consider it in the setting of this cruise. The passengers had paid admission for passage on this rock concert cruise, the very purpose of which was to afford passengers an opportunity to relax, linger and stand around while listening to the music. To find that the passengers on this ship were loitering would mean that patrons of all concerts are loitering. We will not extend the definition of loitering that far. The record discloses no facts to support the conclusion that any intoxicated persons were *loitering*.

Under the circumstances existing at the time of the alleged violation, the defendant may have properly concluded that some of the passengers were intoxicated, but there is no evidence from which the defendant could have concluded that they were loitering.

### III

We next consider the charge that the plaintiffs permitted a "disturbance, brawl, unnecessary noises, unlawful conduct upon the premises and did permit the premises to be conducted in such a manner as to constitute a nuisance."

The transcript discloses that the Anna C. was not the scene of the bacchanalian orgy and battle that the defendant would have us believe. Of the estimated 1000 to 1500 passengers,[4] witnesses estimated that between fifteen and "more than twenty" were involved in a commotion. The trouble was caused by Gary Linkner and William Linkner, two very violent and badly behaving

---

[4] "The ship's capacity was 1600 persons. No evidence of the exact number of the passengers on the cruise was offered, nor was there evidence of the number of tickets sold. The 1000 to 1500 passenger figure stems from testimony of witnesses whose qualifications to make accurate estimates of this type were not established." *Nelseco Navigation Co.* v. *Dept. of Liquor Control,* supra, 27 Conn. App. 617 n.6.

brothers. It is not disputed that the Linkner brothers ran amok throughout the ship, assaulting passengers, urinating on two of them and attempting to touch one or more women in a vulgar and obscene manner. It is not surprising that the Linkners' abusive conduct generated chaos, a disturbance of the peace and pushing and shoving. Security personnel, however, had the situation in hand in five minutes at most when they locked the Linkners in the men's room. The record discloses no further tumultuous activity once the Linkners were removed from circulation nor does it disclose that anyone was assaulted by anyone other than the Linkners.[5]

The issue is whether the plaintiffs "permitted" the conduct to take place and thereby "permitted" the premises to be conducted in such manner as to constitute a nuisance. The defendant found that the plaintiffs did "permit" the conduct to take place and the trial court affirmed the defendant's decision.

The facts and inferences that may be drawn from the evidence in the present case do not support a conclusion that the plaintiffs "permitted" the conduct to take place and thereby "permitted" the premises to be conducted in such manner as to constitute a nuisance. To the contrary, the evidence shows that the plaintiffs, through the onboard security personnel, took swift and positive action to squelch the disturbance. Once the dis-

---

[5] The notice of decision issued by the defendant included the following finding, which shows that no one other than the Linkner brothers was the source of any trouble on the ship. "Laura Derwin, Lisa Grady, Sarah Gallagher, and Anthony Partridge all testified to being on the boat for a period of one hour or more. A fight broke out on the boat which involved more than ten persons. Two brothers named Linkner were involved in the fight and both appeared to be very intoxicated in that they were staggering around and slurring their speech. Grady saw one of the brothers throw a can of beer. Things became so bad on the boat that the brothers had to be locked in the men's room and the boat had to return to shore to have the police remove the trouble makers."

turbance was stopped, the plaintiffs, acting through the ship's captain, returned the vessel to port for the purpose of removing the Linkners from the ship. What more could reasonably have been done?

The defendant contends that there is no fact presented in the record that supports the plaintiffs' argument that the ship's security personnel acted quickly to deal with the situation. This ignores the testimony of Sarah Gallagher that the security guards responded quickly and effectively to her complaint and confronted the Linkner brothers. It also ignores the testimony of Laura Derwin that the disturbance was of short duration "because security guards got them and locked them in the [men's room]."[6]

The defendant argues that the security personnel were not capable of controlling a large and potentially unruly crowd. This conjecture ignores the fact that a problem did arise and the regular security force, augmented by security personnel provided by the charter group, proved more than adequate to meet the needs of the situation.

---

[6] Laura Derwin's testimony regarding the altercation included the following:

"Q. Did you witness an incident that involved the Linkner brothers?
"A. Yes.
"Q. Please tell us where that happened.
"A. We weren't standing around the band; we were away from the band and they just—it was a fight.
"Q. Do you know what started the fight?
"A. Yes. [The Linkner brothers] were harassing people.
"Q. How many people became involved in the fight?
"A. A lot.
"Q. Would you say more than ten?
"A. Yes.
"Q. More than twenty?
"A. I don't know; there was a lot of people there.
"Q. *Was it a fight that lasted for long?*
"A. *No, because they broke it up; the security guards got them and locked them in the place.*" (Emphasis added.)

A statement by Sergeant John Mattson of the New London police department concerning the number of security personnel controlling the situation is of little value. First, Mattson admitted that he did not know how many security personnel were onboard and then opined that they were insufficient in number to control the ship. This opinion is contradicted by the testimony, set forth above, of the ship's passengers. Mattson also testified that he did not think the ship should return to sea.[7] Despite his opinion, Mattson made no attempt to prevent the ship from resuming its cruise. No other disturbances were reported once the Linkners were expelled from the Anna C.

Second, Mattson describes the passengers with a peculiar use of the word "disorderly." He testified that "they were not disorderly in the sense that they were angry, but disorderly because most of them seemed to be happy." He describes the passengers as boisterous, but happy. Mattson also testified that the Linkner brothers' expulsion from the ship elicited a round of applause from the remaining passengers, indicating that the passengers were happy that the "disorderly" persons had been removed.

We conclude having considered the record as a whole and the inferences that may reasonably be drawn therefrom that there was not substantial evidence to support the defendant's finding that the plaintiffs permitted a

[7] Although the recitation of facts in the defendant's brief refers to such a recommendation, it was apparently based on part of the charges brought by the defendant against the plaintiffs. There was no finding in regard to such a recommendation. At best, the record indicates that Mattson told someone that he felt the cruise should not continue, but he was sure that this comment was not relayed to the ship's captain. This is not surprising because Mattson was not sure whether the man to whom he made the comment was an employee of the ship or a pier hand with no connection to the ship. We note that footnote 9 of our earlier decision was in error in characterizing this comment as a finding. See *Nelseco Navigation Co.* v. *Dept. of Liquor Control,* supra, 27 Conn. App. 617 n.9.

disturbance, brawl, unnecessary noises, and unlawful conduct on the premises and permitted the premises to be conducted in such a manner as to constitute a nuisance. The plaintiffs' liquor permit should not, therefore, have been suspended. In light of this conclusion, we need not address the plaintiffs' other claim on appeal.

The judgment of the trial court dismissing the appeal is reversed and the case is remanded with direction to render judgment sustaining the appeal.

In this opinion the other judges concurred.