[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Town of Bloomfield ("plaintiff"), appeals a decision of the defendant, State Board of Labor Relations ("Board"), finding that the plaintiff violated the Municipal Employee Relations Act ("MERA"), General Statutes § 7-460 et seq., by discriminating against, intimidating, interrogating and coercing various employees, Susan Archer ("Archer"), Barbara Peruta ("Peruta") and Diana Watters ("Watters"), and unlawfully laying off two employees, Watters and Fran Wiggins ("Wiggins"). The Board ordered the plaintiff to: (1) cease and desist from (a) discriminating against its employees because of their union or other protected, concerted activities; (b) interfering with, restraining or coercing its employees in the exercise of their protected rights, (2) post the Board's order, and (3) reinstate and make whole the two employees for any loss of compensation or benefits they may have suffered from their layoffs. The plaintiff filed its appeal on January 11, 1995, pursuant to General Statutes § 4-183.
PROCEDURAL AND FACTUAL HISTORY
On February 23, 1990, the National Association of Governmental Employees, Local R1-159 ("NAGE"), filed a petition for election with the Board seeking to represent the plaintiff's employees who work in Town Hall. Return of Record ("ROR") #30, p. 3.
On April 27, 1990, the parties agreed to an appropriate bargaining unit for the plaintiff's employees and to an election date. ROR #30, p. 3. The parties agreed that the position of executive secretary to Town Manager Gary Stenhouse ("Stenhouse") should be excluded as a confidential employee. ROR #30, p. 3. This position was held by Bainie Wild ("Wild"). A majority, of the plaintiff's employees voted in favor of NAGE in the election on June 5, 1990. ROR #30, p. 3.
On December 5, 1990, the Town Manager issued the 1991-92 Budget. ROR #30, p. 4. The plaintiff's final budget, approved in May, 1991, called for the elimination of numerous positions. ROR #30, p. 5. Throughout 1990-91, several employees and NAGE filed prohibited practice charges against the plaintiff. On September 3, CT Page 5198 1991, NAGE filed an amended complaint with the Board, consolidating the other complaints, adding additional charges, and alleging, in part, that the plaintiff, during and after NAGE attempted to organize various employees of the plaintiff, violated MERA by restraining, interrogating, interfering with and coercing employees, unlawfully disciplining, reducing the hours of and laying off employees and by hiring temporary employees after the layoffs were effectuated. ROR #16, #30, pp. 1-2. Various hearings were held before the Board beginning in September, 1991 through January 20, 1993. ROR #28. On November 30, 1994, the Board issued its decision. ROR #30.
The Board held that the plaintiff did not violate MERA prior to the election through various correspondences to the plaintiff's employees from the Town Manager nor did the plaintiff violate MERA during numerous speeches given by the Town Manager regarding the plaintiff's position on unionization. The Board held that none of the allegations involving Lisa Turner violated MERA. The Board held that a warning to, a letter of reprimand to, a one-day suspension of, and the layoff of Archer were not violations of MERA. The Board held that the written warning to Peruta was not a violation of MERA. The Board also held that the hiring of temporary employees was not a violation of MERA.
The Board held, however, that the plaintiff violated MERA by discriminating against, intimidating, interrogating and coercing Archer, Peruta and Watters. The plaintiff violated MERA by laying off Watters and Wiggins.
Critical to the Board's decision was the determination that Wild and Robert Sanborn ("Sanborn") were supervisors as defined in General Statutes § 7-471 (2).
On appeal, the plaintiff argues that: (1) Wild was legally incapable of unlawfully monitoring, threatening, coercing, intimidating, interfering with or discriminating against any employee in the exercise of the employee's rights under MERA, because she was a confidential employee and not a supervisor; (2) Wild's job functions do not support a finding that she was a supervisor for purposes of MERA, (3) the facts do not support the finding that Wild was an agent of the plaintiff for purposes of MERA, (4) even assuming that Wild was a supervisor or agent of the plaintiff, the plaintiff's retraction of any unlawful conduct or statements by Wild effectively cured any taint imputable to the plaintiff, (5) the Board erred in finding that Wild interrogated, CT Page 5199 interfered, threatened, coerced, harassed, monitored, and discriminatingly issued discipline to Archer and Peruta, and (6) the layoffs of Watters and Wiggins were not in retaliation for exercising their protected rights.
The parties have filed briefs and argument was heard by the court on October 28, 1996.
JURISDICTION
Appeals to courts from administrative agencies exist only under statutory authority. Killingly v. Connecticut SitingCouncil, 220 Conn. 516, 521, 600 A.2d 752 (1991). A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions which create it. Citizens AgainstPollution Northwest, Inc. v. Connecticut Siting Council,217 Conn. 143, 152, 584 A.2d 1183 (1991). Failure to comply strictly with the statutory provisions by which a statutory right to appeal is created will subject an appeal to dismissal. Killingly v.Connecticut Siting Council, supra, 522.
A. Aggrievement
This court has jurisdiction to review the instant matter pursuant to MERA. Section 7-471 provides, in pertinent part, that: "[f]or purposes of hearings and enforcement of orders under sections 7-467 to 7-477 [concerning prohibited practices], inclusive, the Board shall have the same power and authority as it has in sections 31-107, 31-108 and 31-109, and the municipal employer and the employee organization shall have the right of appeal as provided therein." General Statutes § 7-471 (5)(D). Section 31-109 provides, in relevant part, that "[a]ny person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may appeal pursuant to the provisions of chapter 54 to the superior court. . . ." General Statutes § 31-109 (d). Under chapter 54, "[a] person who has exhausted his administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court. . . ." General Statutes § 4-183 (a).
Aggrievement is a jurisdictional matter and a prerequisite for maintaining an appeal. Winchester Woods Associates v. Planning Zoning Commission, 219 Conn. 303, 307, 592 A.2d 953 (1991). "The question of aggrievement is essentially one of standing."DiBonaventura v. Zoning Board of Appeals, 24 Conn. App. 369, 373, CT Page 5200588 A.2d 244, cert. denied, 219 Conn. 903 (1991). Unless the plaintiff alleges and proves aggrievement, the court must dismiss the appeal. Id. "To be an aggrieved person, one must be affected directly or in relation to a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as is the concern of all members of the community, and the appellant must be specifically and injuriously affected as to property or other legal rights." Smith v. Planningand Zoning Board, 203 Conn. 317, 321, 524 A.2d 1128 (1987).
In the present case, the Board's decision directly affected the plaintiff's rights by finding that the plaintiff violated MERA. The agency decision forces the plaintiff to reinstate two employees and compensate them for back pay and post the Board's adverse decision. Therefore, the plaintiff has been aggrieved by the Board's decision.
B. Timeliness
In order to take advantage of a statutory right to appeal from a decision of an administrative agency, there must be strict compliance with the statutory provisions which created the right.Simko v. Zoning Board of Appeals, 206 Conn. 374, 377, 538 A.2d 202
(1988). These provisions are mandatory and jurisdictional; failure to comply subjects the appeal to dismissal. Capalbo v. Planning Zoning Board of Appeals, 208 Conn. 480, 485, 547 A.2d 528 (1988). Thus, where an appeal is filed after the statutory appeal period has expired, the trial court lacks subject matter jurisdiction over the appeal. Upjohn Co. v. Zoning Board of Appeals, 224 Conn. 96,102, 616 A.2d 793 (1992).
General Statutes § 4-183(c) mandates a forty-five day statute of limitations to appeal an administrative decision to the superior court. In the present case, the final decision was rendered on November 30, 1994. Service occurred on January 12, 1995. Therefore, since only forty-three days have passed, the plaintiff's appeal is timely.
STANDARD OF REVIEW
General Statutes § 4-183 (j) provides the scope of review as follows: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been CT Page 5201 prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse or discretion or clearly unwarranted exercise of discretion." General Statutes §4-183 (j).
"[T]he [reviewing] court may not retry the case or substitute its judgment for that of the agency on the weight of the evidence or questions of fact. . . . Rather, an agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . ." (Citations omitted; internal quotations omitted.) Local 1183 of Council No. 4 v. State Board of LaborRelations, 33 Conn. App. 541, 546, 636 A.2d 1366 (1994). "The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached." DeBeradinis v. Zoning Commission,228 Conn. 187, 198, 635 A.2d 1220 (1994). "[I]t is the function of the courts, [however,] to expound and apply governing principles of law." (Internal quotation marks omitted.) Lieberman v. StateBoard of Labor Relations, 216 Conn. 253, 262, 579 A.2d 505 (1990). As in any administrative appeal, the plaintiff bears the burden of proving that the Board's decision is not supported by substantial evidence. See Schallenkamp v. DelPonte, 229 Conn. 31, 39,639 A.2d 1081 (1994).
DISCUSSION
A. Status of Bainie Wild
1. Confidential Employee
The plaintiff's first argument against the Board's decision is that Wild was not a supervisor within the meaning of MERA, because she was a confidential employee. "Confidential employees" are defined under the National Labor Relations Act[1] (NLRA), as employees "who assist and act in a confidential capacity to persons who formulate, determine and effectuate management policies in the field of labor relations." (Citation omitted; internal quotation marks omitted.) Kleinberg, Kaplan, Wolff, Cohen Burrows, P.C.,
253 NLRB 450, 451 (1980). The plaintiff argues that confidential employees are legally distinct from supervisory employees. The CT Page 5202 plaintiff argues that while supervisors are deemed to be part of the employer and are not permitted to interfere with, coerce, restrain, interrogate or threaten employees in their exercise of their rights under MERA, confidential employees do not face those restrictions. As a confidential employee, Wild was incapable of such unlawful acts. The plaintiff argues that Wild could not have been classified as both a confidential and a supervisory employee.
The Board argues that an agreement reached during negotiations between the plaintiff and NAGE that Wild was a confidential employee does not preclude the Board from determining Wild was a supervisor in a subsequent prohibited practices proceeding. In its decision, the Board made it clear that being a confidential and a supervisory employee are not mutually exclusive. "Wild was clearly a supervisor during this period and was held out by management as having supervisory authority. Although ultimately agreement was reached to exclude her as a confidential employee, that does not preclude her from also being a supervisor, as we find in this case." ROR #30, p. 38 n. 8.[2] "The board shall have the power to determine whether a position is covered by sections 7-467 to 7-477, inclusive, in the event of a dispute between the municipal employer and an employee organization. In determining whether a position is supervisory the board shall consider, among other criteria, whether the principal functions of the position are characterized by not fewer than two of the following: (A) Performing such management control duties as scheduling, assigning, overseeing and reviewing the work of subordinate employees; (B) performing such duties as are distinct and dissimilar from those performed by the employees supervised; (c) exercising judgment in adjusting grievances, applying other established personnel policies and procedures and in enforcing the provisions of a collective bargaining agreement; and (D) establishing or participating in the establishment of performance standards for subordinate employees and taking corrective measures to implement those standards." General Statutes § 7-471 (2).
The plaintiff argues that Wild's job functions do not support a finding that Wild was a supervisor. The Board found that Wild's job functions support a finding that she was a supervisor: "Bainie Wild held the position of Executive Secretary to the Town Manager from 1989 up until January 1991. At that time her title was changed to Executive Assistant, but apparently her duties remained essentially the same. Her duties included handling the administrative work for the Town Manager and the Assistant Town Manager, scheduling meetings, correspondence, and research and CT Page 5203 writing. She also provided assistance to the Town Council and the Mayor. Much of Wild's work was clerical, including typing and filing.
"Wild also supervised the recording secretary, Susan Archer, as reflected in Archer's job description. . . . Wild also supervised the switchboard operator, Peruta. Wild was responsible for delegating work to Archer and Peruta and was responsible for the adequacy and completeness of their work product. On a daily basis, Archer and Peruta reported solely to Wild, who authorized their time off, performed their probationary evaluations and issued their time off, performed their probationary evaluations and issued several letters of criticism or formal reprimand to Archer. Ninety percent of Wild's time was spent on her own clerical/administrative tasks, including the various supervisory functions of assessing performances, monitoring hours, attendance, and the whereabouts of employees, preparing letters of warning and reprimand, meeting with employees and preparing for and participating in the disciplinary hearings including Archer and Peruta. Ten percent of Wild's time was actually spent reviewing Susan Archer's minutes.
"As Executive Secretary to the Town Manager, Wild was excluded from the bargaining unit as a confidential employee. She was aware that at the start of the organizing effort, union supporters felt she should be excluded. She learned that her exclusion as a confidential was a possibility as of the first informal conference with the Labor Board staff on April 11, 1990. By the time of the Assistant Agent's recommendations for an election dated April 27, 1990, the parties had agreed to her exclusion as a confidential employee, and Wild was aware of that exclusion.
"During at least January, February, and March 1990, prior to being formally excluded from the unit, Wild did discuss the pros and cons of unionization with Peruta, Archer and other employees. She emphasized concerns about loss of flexibility, in matters such as break times, doctors' appointments, etc., which she observed were restricted in other bargaining units in Bloomfield where there was already a union." ROR #30, pp. 6-7. Therefore, the Board concluded that "Bainie Wild was a supervisor within the meaning of the Act [MERA] at all times material to the instant case." ROR #30, p. 24.
"In reviewing a final order of the . . . [Board], the Superior Court does not try the matter de novo. . . . The court can do no more, on the factual questions presented, than to examine the CT Page 5204 record to determine whether the ultimate findings of the . . . [Board] were supported, as the statute requires, by substantial evidence." L. Suzio Construction Co. v. Connecticut State Board ofLabor Relations, 148 Conn. 135, 138, 168 A.2d 553 (1961); General Statutes § 31-109 (b). When there is a conflict in the evidence, the board is entitled to accept that which it considers the more credible. Bisogno v. Connecticut State Board of Labor Relations,150 Conn. 597, 602, 192 A.2d 550 (1963). Moreover, the board may use its experience and specialized knowledge in the evaluation of evidence. Local 1219 v. Connecticut Labor Relations Board,171 Conn. 342, 350-51, 370 A.2d 952 (1976). "A challenged finding of fact is tested by the evidence printed in the appendices." SuccessVillage Apartments, Inc. v. Local 376, 175 Conn. 165, 170397 A.2d 85 (1978).
To sustain the plaintiff's appeal, the court must find that the Board unlawfully digressed from the criteria of § 7-471 (2), which would be noted in the record by a lack of evidence to support the Board's finding.
The record, however, indicates that Wild did serve in a supervisory role over some employees of the plaintiff. In a memorandum to Archer dated July 11, 1990, Wild reprimanded and evaluated Archer's failures to perform her duties. ROR #28 (12). In that memorandum, there is no mention of the reprimand coming from any supervisor other than Wild. ROR #28 (12). In a memorandum dated December 7, 1990, Wild reprimanded Archer regarding an illegal meeting of the Ethics Commission of the Town. ROR #28 (13).
Another memorandum to Archer dated February 8, 1991, came from Wild. ROR #28 (14). This memorandum however, not only reprimanded Archer, but called for "the institution of serious disciplinary action against" Archer. ROR #28 (14). Again, it was Wild who initiated the reprimand and disciplinary action. ROR #28 (14). report issued by Keith Harrigan ("Harrigan"), Assistant Town Manager, after a fair hearing between Wild and Archer identifies Wild as Archer's supervisor, and states "Wild's supervisory authority is delegated directly from the Town Manager." ROR #28 (15). Another memorandum from Wild to Archer requests a meeting for a "discussion of your performance, your understanding and expectation of the job, and what is required of you." ROR #28 (17).
The incident and memoranda regarding Archer are not the on CT Page 5205 evidence in the record from which the Board could draw the conclusion that Wild was a supervisor. A letter of appointment to Peruta names Wild as her supervisor. ROR #28 (23(B)). A letter; noting the completion of Peruta's probationary period of employment mentions that Wild reviewed her work and made a recommendation. ROR #28 (23(F)). Another memorandum includes the recommendation from Wild that Peruta receive a pay increase. ROR #28 (23(K)). Wild also informed Peruta of a possible violation of the Personnel Rules. ROR #28 (24). A report issued by Harrigan after a hearing between Wild and Peruta identifies Wild as the supervisor. ROR #28 (25).
The evidence in the record adequately supports the Board's finding that Wild was a supervisor. The evidence supports a finding that Wild assigned, oversaw and reviewed the work of subordinates. See General Statutes § 7-471 (2)(A). Additionally, Wild took corrective measures of implementing performance standards by calling for disciplinary hearings and meetings with subordinate employees. See General Statutes § 7-471 (2)(D). The evidence in the record supports the Board's finding that Wild was a supervisor under MERA.
2. Agent of the Plaintiff
The plaintiff also challenges the Board's finding that Wild was an agent of the plaintiff when she committed her alleged unlawful activity. If Wild was not an agent, the plaintiff contends, Wild's behavior cannot be imputed to the plaintiff. If true, all of the Board's findings where Wild acted in violation of MERA were an improper focus of the Board and would have to be reversed. The Board argues that there is sufficient evidence in the record to support the Board's finding.
The existence of an agency relationship is a question of fact.Beckenstein v. Potter Carrier, Inc., 191 Conn. 120, 133,464 A.2d 6 (1983). The court is limited, when reviewing a factual determination, to review the record in order to discover if the agency's decision is supported by the evidence. Success VillageApartments, Inc. v. Local 376, supra, 175 Conn. 170.
The Board's finding that Wild was an agent of the plaintiff is in reality an alternative argument to Wild's status as a supervisor. The Board found Wild to be a supervisor within the meaning of MERA. ROR #30, pp. 24, 32. Additionally, the Board stated that: "we believe that Wild was an agent of the Town CT Page 5206 regardless of whether she met the statutory definition of "supervisor" found in [General Statutes] § 7-471 (2). The definition of "municipal employer" found in § 7-471 includes `. . . person or persons designated by the municipal employer to act in its interest in dealing with municipal employees.' Here we find that Wild was designated by the Town to represent its interests in dealing with employees under her supervision. For example, the Town knowingly permitting Wild to issue various warning letters, to institute disciplinary proceedings against employees, and to work in conjunction with the Town Attorney on matters involving the employment and discipline of her subordinates." ROR #30, p. 32 n. 6.
Using the same evidence as above that supported the Board's finding that Wild was a supervisor, the Board's decision that Wild was at least an agent of the plaintiff and within the statutory definition of "municipal employer," is adequately supported in the record. Furthermore, the Board's finding that Wild was an agent of the plaintiff is peripheral to the Board's finding that she was a supervisor. Since she was found to be a supervisor, Wild's actions were already to be imputed to the plaintiff. The finding that Wild was an agent of the plaintiff was unnecessary insurance, yet still supported by the record.
Therefore, this court holds that the Board's finding that Wild was (1) a supervisor, and (2) an agent of the plaintiff is supported by substantial evidence.
B. Violations of MERA
The plaintiff argues that even if Wild's actions can be imputed to the plaintiff, her alleged acts did not rise to the level of unlawful conduct under MERA against Archer and Peruta.[3]
The plaintiff maintains that to constitute a prohibited practice, the statement must be made by a supervisor and contain a threat of reprisal or force, or promise of a benefit. The plaintiff argues that Wild was not a supervisor and her statements fell outside that which is unlawful. The issue of Wild's status has already been fully discussed and determined to be that of a supervisor. With regard to the remaining issue the Board counters that there is substantial evidence to support the Board's finding concerning Wild's anti-union animus and her disproportionate response to certain situations as a result of that animus.
To determine whether the act of an employer or a supervisor CT Page 5207 violates MERA, the Board first requires the complainant to "make aprima facie showing sufficient to support the inference that protected conduct was a `motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." (Emphasis in original.) Wright Line, 251 NLRB 1083, 1089 (1980), aff'd,662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982). "Aprima facie case includes proof that 1) the employee engaged in protected concerted activities, 2) the employer had knowledge of those activities and 3) the employer harbored anti-union animus." (Emphasis in original.) Sheriff's Department, Fairfield County,
SLRB Decision No. 3106-B (1993).
The protected conduct of the employees are that "Employees shall have, and shall be protected in the exercise of, the right of self-organization, to form, join or assist any employee organization, to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, free from actual interference, restraint or coercion." General Statutes § 7-468(a). "Municipal employers . . . are prohibited from: (1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed in section7-468; (2) dominating or interfering with the formation, existence or administration of any employee organization; (3) discharging or otherwise discriminating against an employee because he has signed or filed any affidavit, petition or complaint or given any information or testimony . . . ." General Statutes § 7-470 (a).
The plaintiff argues that the Board erroneously chose to believe the testimony of the NAGE employees in favor of the management witnesses. Additionally, the plaintiff posits that the Board did not consider the actions of management to diffuse the tension in the Town Manager's office before adopting the union employees' version. "However, the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." (Citation omitted; internal quotation marks omitted.) Fleischman v. Board of Examiners,22 Conn. App. 193, 197, 576 A.2d 1308 (1990). An administrative agency is not required to believe any witness. Id. "In determining whether an administrative finding is supported by substantial evidence, a court must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve CT Page 5208 the evidence presented by any witness, in whole or in part. . . ." (Citation omitted; internal quotation marks omitted.) ConnecticutBuilding Wrecking Co. v. Carothers, 218 Conn. 580, 593,590 A.2d 447 (1991).
The record reveals substantial evidence to support the Board's findings. With regard to Archer, the Board found that Wild's actions violated MERA by creating an intimidating work environment, recommending that Archer be terminated and the institution of a hearing to address Archer's situation. ROR #30, p. 25, ¶ 10. Additionally, the Board found that Wild interrogated Archer on her union views and intimidated Archer through Wild's remarks regarding the outcome of unionization. ROR #30, p. 25, ¶ 11. With regard to Peruta, the Board found Wild's actions violated MERA by Wild's monitoring of Peruta's whereabouts and use of time, recommending Peruta's termination and subjecting Peruta to an elaborate hearing concerning the misuse of time. ROR #30, p. 25, ¶ 15.
The transcripts of the hearing before the Board are filled with testimony by the complainants that they were being discriminated against because of their pro-union views. Archer testified that she engaged in union activities. ROR #28, Vol. II, p. 139. She also testified that management knew of her activities. ROR #28, Vol. II, p. 139. The record reveals that it was Wild who made statements which were anti-union as testified to by Archer. ROR #28, Vol. II, pp. 139-46. Peruta also testified that she engaged in protected conduct. ROR #28, Vol. III, pp. 300-02. Peruta testified that Wild had knowledge of her conduct. ROR #28, Vol. III, p. 301. Furthermore, Peruta testified to the anti-union animus displayed by her supervisor and management. ROR #28, Vol. III, pp. 303-10. Peruta also specifically testified as to the actions of Wild, her supervisor. ROR #28, Vol. III, pp. 311-12, 316-17.
Wild had an opportunity to testify as well. Wild testified that while discussions took place regarding the formation of a union, these talks were informal and held not in her office but by Archer's or Peruta's work stations. ROR #28, Vol. VIII, pp. 33-35. Wild testified to a cordial atmosphere in the work place, where healthy dialogue was terminated only after the union reported who would be eligible and after a cautioning from the Board. ROR #28, Vol. VIII, pp. 40-45. Wild testified that the discipline of Archer was because of poor work performance; ROR #28, Vol. VIII, p. 15; as was her termination. ROR #28, Vol. VIII, p. 71. Wild testified that it was her employees who began changing their work CT Page 5209 relationship for the worse. ROR #28, Vol. VIII, p. 51. Wild testified that Peruta's discipline and termination were non-union related but focused on her poor work performance. ROR #28, Vol. VIII, pp. 72-78, 81-87.
With the evidence and testimony before it, the Board gave more credence to Archer's and Peruta's testimony, as is within its discretion. The Board determined that Wild did not satisfy herWright-Line burden while Archer and Peruta did. There is substantial evidence in the record to support the Board's finding that Wild violated MERA.
The Board's assessment of credibility of witnesses is deferred to in an administrative hearing, and that the Board chose to believe the pro-union employees over their supervisor and management is the Board's prerogative. The Board found a primafacie showing by the complainants that their protected conduct motivated the plaintiff's actions, and that the plaintiff did not satisfy its burden.
Therefore, this court holds that the Board's finding that Wild violated MERA is supported by substantial evidence.
C. The Layoffs
In its final argument, the plaintiff contends that the layoffs of Watters and Wiggins were not motivated by anti-union animus but by budgetary restraints. Furthermore, the plaintiff argues that Wild was not the supervisor of Wiggins and Watters and consequently her conduct cannot be considered in the finding that an anti-union animus existed. Additionally, the plaintiff argues that Sanborn's conduct cannot be considered in the Board's finding of an anti-union animus. The Board argues that the plaintiff failed to offer a clear and consistent reason for the discharges, and therefore the Board's decision is supported in the record.
In determining whether a layoff is the product of discriminatory motivation, the Wright Line standard, as discussed above, applies. Therefore, there first must be a prima facie
showing that the employees' protected conduct motivated the employer. Then the burden shifts to the employer to show that the action taken would have occurred anyway. The Board found that the layoff of Wiggins was in retaliation for her union activities, ROR #30, p. 25, ¶ 9, as was the layoff of Watters. ROR #30, p. 26, ¶ 18. CT Page 5210
If "the specific evidence cited in support of an administrative officer's ultimate finding is inadequate to support that ultimate factual conclusion, a reviewing court should search the record of the entire proceedings to determine whether it does in fact contain substantial evidence from which the ultimate factual finding could reasonably be inferred." ConnecticutBuilding Wreckers v. Carothers, supra, 218 Conn. 601. Thus, if the administrative record provides substantial evidence upon which the hearing officer could have reasonably based his findings, the decision will be upheld. Id. Therefore, that the Board relied on Wild's activities to find an anti-union animus does not void the Board's decision, if there is other evidence within the record that demonstrates such an animus.
The layoff of Wiggins bothered the Board because of the status of Wiggins within the union. She was acting union officer, negotiator and steward. ROR #30, p. 36. When the choice of Wiggins as the individual to be laid off was reviewed by the Board, the testimony of Stenhouse created the prima facie evidence the Board needed. ROR #30, p. 37. Stenhouse first indicated that Wiggins was the least senior member of her office. ROR #28, Vol IX, p. 151. However, his testimony then changed and he stated that seniority was not the reason for Wiggins' layoff. ROR #28, Vol. X, p. 8. The Board found this contradiction suspicious and held that a preponderance of the evidence established that Wiggins was terminated because of (1) her pronounced union activity, (2) the anti-union animus of the plaintiff, and (3) the absence of any coherent explanation for her termination. ROR #30, p. 37.
The reduction of Watters' hours and her eventual discharge also caused problems for the Board. Watters was a union officer, negotiator and a principal union organizer. ROR #30, p. 43; ROR #28, Vol. V, pp. 596, 620-21, 624-25. Watters testified that management knew of her activities. ROR #28, Vol. V, p. 621. Watters testified, without rebuttal, that Sanborn interrogated her about her union activities, threatened the loss of benefits and overall created an intimidating atmosphere.[4] ROR #30, p. 43; ROR #28, Vol. V, pp. 608, 615-16, 625. Watters testified that Sanborn was one of management's most active violators. ROR #28, Vol. V, pp. 626-43.
Watters also testified that she knew of her impending diminished hours. ROR #28, Vol. V, p. 649. She was assured that she would have employment if not in her office at least elsewhere CT Page 5211 in Town Hall. ROR #28, Vol. V, p. 650. Watters testified that her reduction in hours, and eventual layoff, occurred because it was a way of curtailing her union activities. ROR #28, Vol. V, pp. 655-56.
Therefore, Watters had demonstrated a prima facie showing that there was an anti-union animus which resulted in her layoff. ROR #30, p. 43.
The only defense given to the Board regarding Watters' layoff was that after a study, it was concluded that management employees were able to do some of the work they had previously relied on the clerical staff to do. ROR #28, Vol. V, p. 659, Vol IX, p. 152. Sanborn told Watters that her job would not be in jeopardy, because she would be reduced in hours at one position, but would gain hours at another. That same day, however, Sanborn recommended that Watters' employment be reduced to 8-10 hours per week. ROR #28, Vol. V, pp. 653-54. Looking at the lack of explanation for the reduction in hours, the interrogation and threats regarding Watters' union activities, and Watters' profile within the union, the Board found that the plaintiff did not sufficiently rebut theprima facie showing by the claimant. ROR #30, p. 43.
There is abundant evidence in the record to support the Board's initial finding of prima facie evidence that Wiggins' and Watters' protected conduct was the motivation behind their layoffs. Furthermore, the evidence supports the fact that the plaintiff had no defenses to offer regarding the layoffs. The plaintiff argues that the Board's decision that the layoffs of Archer and Turner did not violate MERA, while the layoffs of Wiggins and Watters did violate MERA, proves the Board's arbitrariness. The facts actually support the opposite inference. There was rebuttal from the plaintiff concerning the layoffs of Archer and Turner that the Board may have believed. However, there was no rebuttal or, at best, an inconsistent reason offered, concerning the layoffs of Watters and Wiggins. As a result, the only sufficient evidence provided to the Board was that of Watters and Wiggins, showing retaliatory action by the plaintiff.
Therefore, this court holds that the Board's finding that the layoffs of Watters and Wiggins violated MERA is supported by substantial evidence.
CONCLUSION
There is substantial evidence in the record to support the CT Page 5212 Board's finding that Wild was a supervisor within General Statutes § 7-471 (2). Although unnecessary, the evidence supports the Board's conclusion that Wild was an agent of the plaintiff. Additionally, the evidence supports the finding that Wild violated MERA with regard to her conduct towards Archer and Peruta. The reports by Harrigan do not serve as a repudiation by the plaintiff, since they do not recant any of Wild's harassment. As for the layoffs, both Wiggins and Watters demonstrated that prima facie
evidence existed that they were engaged in protected conduct, management knew of their activities and that there was an anti-union animus created by the plaintiff. Their proffers shifted the burden onto the plaintiff to demonstrate any non-union factors that motivated the plaintiff's conduct. The plaintiff failed in its burden. Stenhouse provided contradictory testimony and Sanborn did not testify at all.
Accordingly, the plaintiff's appeal is dismissed.
PECK, J.