[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, BEC Corporation, Irvin A. Shiner and Michael Shiner, appeal from the final decision of the Department of Environmental Protection ("DEP") dated December 19, 1997 Order No. MT 96-01. The appeal is authorized and is undertaken pursuant to the Uniform Administrative Procedure Act ("UAPA"), General Statutes §§ 4-166 et seq. and 4-183.
The final decision essentially affirms a DEP order that found that the plaintiffs have created or are maintaining a facility or condition which reasonably can be expected to create a source of pollution to the waters of the state. The order also found BEC, as the owner of the site, maintained a discharge into the waters of the state without a permit. The plaintiffs were thus ordered to undertake remediation efforts pursuant to General Statutes §§22a-6, 22a-424, 22a-427, 22a-430, 22a-431, 22a-432
and 22a-449.
The property has been used by BEC and its corporate predecessors as an oil storage and distribution site since at CT Page 6528 least 1944 until approximately May 15, 1995. The site includes a barge docking facility for the unloading of oil barges, above-ground oil storage tanks, loading racks for loading oil from the tanks into oil tanker trucks and piping to carry oil from the barge docking facility to the oil storage tanks. In addition, the site includes an office building, warehouse, garage and other structures.
The plaintiff BEC is the owner of the property and the plaintiffs Irvin and Michael Shiner are personally subject to the DEP order. Thus, all plaintiffs are aggrieved persons who may maintain this appeal pursuant to the UAPA, § 4-183. See also NewEngland Rehabilitation Hospitals of Hartford, Inc. v. Commissionon Hospital and Health Care, 226 Conn. 105, 120 (1993).
In their appeal, the plaintiffs raise the following issues: (1) the sufficiency of the evidence in the record supporting the final decision; (2) the burden of proof standard used by the hearing officer; (3) the imposition of personal liability on the Shiners; and (4) the use of evidence submitted at the re-opened hearing on October 1, 1997.
At the outset, the court notes the "standard of review for all of the plaintiff's claims on appeal. Because [the court is] reviewing the decision of an administrative agency, [the court's] review is highly deferential. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . ." (Citations omitted; internal quotation marks omitted.) Bezzini v. Dept. of Social Services,49 Conn. App. 432, 436 (1998).
The court's "review of an agency's factual determination is constrained by General Statutes § 4-183(j), which mandates that CT Page 6529 a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (5) clearly erroneous in view of the reliable, probate, and substantial evidence on the whole record. . . . This limited standard of review dictates that, with regard to questions of fact, it is neither the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency. . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the plaintiffs to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.) New England Cable Television Assn., Inc. v. DPUC,247 Conn. 95, 117-18 (1998).
The June 6, 1996 DEP Order No. MT 96-01 to the plaintiffs was the subject of a timely appeal by the plaintiffs and was the subject of public hearings before DEP Hearing Officer Donald H. Levinson. Hearings were held on the plaintiffs' appeal on November 20 and 22, December 10 and 13, 1996 and January 10, 24 and 31, 1997. The DEP staff moved to re-open and an additional day of hearing was held on October 1, 1997. At the hearings, the complaints were in effect prosecuted by the staff of the waste management bureau of the DEP. The plaintiffs appeared through counsel and presented evidence, cross-examined witnesses and argued the facts and law. The hearing officer on December 19, 1997 issued a final decision essentially upholding Order No. MT 96-01. The plaintiffs filed this administrative appeal to the Superior Court on January 30, 1998. The answer and record were filed on May 4, 1998. Briefs were filed by the plaintiff on August 25, 1998 and the defendants on October 13, 1998. The parties were heard in oral argument on January 26, 1999.
Following a review of the record, the court finds that the facts set forth in the final decision are supported by CT Page 6530 substantial evidence in the record.
The site, 101-105 Water Street, West Haven, Connecticut is bordered in part by the West River and New Haven Harbor. The corporate plaintiff and its predecessors operated an oil storage and distribution business at the site from 1944 to 1995.
The oil storage tanks are located on pilings in a row in the northwest corner of the site near Water Street. Four of the tanks hold 15,000 barrels of oil each and one tank holds 5,000 barrels. A barrel of oil is equivalent to 42 gallons of oil. The tanks are surrounded by a concrete dike and the concrete foundation of a structure on the neighboring property. The five tanks, dike and foundation wall surrounding the tanks and unpaved floor beneath the tanks in the diked area are referred to as the "tank farm." An intermittent spring runs through the tank farm and the floor of the tank farm is wet and frequently covered in water from both the spring and precipitation. Water in the tank farm is drained by a manually operated pump which empties oil into an oil/water separator.
The site at one time had a tank farm and loading rack on the southeast corner of the property. This former tank farm included five above-ground oil storage tanks; two at the capacity of 20,000 barrels each and three with a 15,000 barrel capacity. The floor of this former tank farm was unpaved and the tank closest to the West River was surrounded by several inches of water during high tide. The former tank farm was removed about 1988 with its location paved over and converted to a dry-docking facility which is rented to another entity unconnected with oil storage and delivery business.
The site has a high water table as evidenced by the spring in the tank farm, the wet floor of the tank farm and the former tank farm and the site's proximity to the West River. The site's proximity to New Haven Harbor subjects the ground water underlying the site to tidal influences.
The site was purchased by the Connecticut Refining Company ("CRC") on or about December 29, 1944. CRC, pursuant to General Statutes § 33-367, merged with Benzoline Energy Co. ("Benzoline") on December 3, 1996. The surviving corporation retained the name Benzoline Energy Co. Benzoline changed its name to BEC Corporation on May 9, 1995 pursuant to General Statutes § 33-360. BEC, on May 9, 1995, terminated all of its employees and sold all CT Page 6531 of its assets with the exception of the real property at 101-105 Water Street including its tank farm and on site buildings. The assets were sold to Alliance Energy Corporation ("Alliance") which leased the office building on the site from BEC but did not operate an oil terminal at the site. In 1997, Alliance sold its business operation at the site to Heating Oil Partners, Inc.
The plaintiff Irvin Shiner was "President of CRC from at least 1968 until is merger with Benzoline. He was President of Benzoline prior to its merger with CRC and remained so until Benzoline's name changed to BEC in 1995. He has been BEC's President since 1995 and owns or co-owns 100% of its voting stock. Irvin Shiner supervised the day-to-day operations of CRC and Benzoline and made most of the major decisions regarding their operations. He has performed the same capacity with BEC. In performing such duties, Irvin Shiner has typically been at the site 5 days a week since at least 1968.
Michael Shiner served as Vice-president/Secretary of CRC and then Benzoline from approximately 1975 to May 9, 1995. He has been Vice President/Secretary of BEC since 1995. Michael Shiner reported directly to his father Irvin Shiner, and in the absence of Irvin Shiner, Michael Shiner was in charge of the company's operations.
In the late 1980's, Michael Shiner assumed greater responsibility for supervising the day-to-day operations at the site although Irvin Shiner remained involved in major corporate and operational decisions. Michael Shiner, since approximately 1973, oversaw the company's environmental compliance. In this capacity, he coordinated the preparation of spill prevention control and counter measure plans for the corporations, communicated with government agencies such as the Department of Environmental Protection and the United States Coast Guard ("Coast Guard"). In environmental inspections of the site, Michael Shiner would generally accompany government employees conducting such inspections.
Since the early 1970s, it was the policy of CRC and its successor companies that employees notify either Irvin or Michael Shiner of oil releases at the site. Michael Shiner coordinated the response to the spills. Irvin Shiner was at the site within twenty-four hours of every oil release since 1970 except for one release in 1992, which occurred while he was away on vacation. CT Page 6532
There have been a history of oil spills on the site. On or about October 5, 1971, approximately 900 gallons of oil spilled onto the floor of the former tank farm when one of its tanks overflowed during the unloading of an oil barge. At the time of this incident, the former tank farm was being leased from CRC by Metropolitan Petroleum Company ("Metropolitan"). The oil on the floor of the former tank farm was collected by employees of Metropolitan or another oil company using absorbent material and a vacuum truck. No soils were removed from the site of the former tank farm or remediated following this incident.
In August of 1977. oil was observed leaching into the West River from the vicinity of the bulkhead in the northeast corner of the site. Michael Shiner engaged a private contractor to locate the source of the discharge and clean it up. The contractor installed a boom to contain and remove the oil that leached into the river and installed an oil collection system landward of the bulkhead to collect the oil in the soils and to prevent additional oil from leaching into the West River. The contractor determined that the oil was coming from a leaking underground pipe which was replaced with an above-ground pipe and oil soaked soils were removed from the vicinity of the leak. Despite these remedial efforts, oil continued to leach into the West River. The oil collection system was expanded and enlarged, but the leaching continued. In October of 1978, the Coast Guard determined that the efforts of CRC were not preventing oil from leaching into the West River and took over the clean up efforts. The Coast Guard collected the oil leaching into the West River, pumped out the collection pits dug by the contractor, and dug a series of test pits which revealed large amounts of oil in the area of the former tank farm. On October 6, 1978, the Coast Guard discovered that the source of that oil was a leaking underground pipe near the former tank farm's loading rack. In the period from October 5 to October 16, 1978, the Coast Guard recovered more than 2,832 gallons of oil from the site. Following the discovery of the second leak, CRC replaced the remaining underground piping at the site at the direction of the Coast Guard and DEP. No additional sampling or investigation of the soils in the vicinity of the leaks was conducted at that time.
Thereafter, on or about December 2, 1984, the tank closest to the West River in the former tank farm overflowed during the unloading of an oil barge. Four hundred gallons of oil were released into and immediately outside of the former tank farm with oil spraying into the West River. Michael Shiner was called CT Page 6533 to the site by CRC employees and he contacted a private contractor, East Coast Environmental ("East Coast") to clean up the spill. East Coast removed some of the surface soils from in and around the former tank farm and used a boom (a floating containment barrier used to contain floating oil) to contain the oil which had sprayed into the West River. No analysis or remediation of the soils in the vicinity of the spill was conducted after the East Coast clean up was completed.
A valve on one of the tanks froze and cracked causing 35,000 to 40,000 gallons of oil to spill onto the floor of the tank farm on or about December 26, 1992. The DEP Oil and Chemical Spill Response Division ("OCSRD") was notified of the spill on such date and OCSRD staff observed 6 to 12 inches of oil covering the floor of the tank farm upon their arrival at the site. Oil from this release penetrated the soils of the tank farm. Michael Shiner, on the day of the release, contracted a private contractor, National Oil ("National") to clean up the release. National pumped out the oil/water mixture within the dike area of the tank farm later that day and removed and replaced some of the soils within the tank farm two or three weeks later. Following this incident no one analyzed the soils remaining in the tank farm for potential contamination or performed any additional remediation of the release after National completed its clean up. Following the National clean up, Benzoline employees noticed that water pumped out of the tank farm had an oily sheen. Benzoline then installed an oil/water separator inside the tank farm to remove that oil on a continuous basis.
In March of 1995, Irvin and Michael Shiner decided to have the tanks in the tank farm removed from the site. To facilitate the removal of the remaining oil in the tanks and to allow prospective removal contractors to view the inside of the tanks, Michael Shiner asked Paul Criscio (a former BEC employee then employed by Alliance) to have the manway covers removed from each of the tanks. The manway covers were removed in March of 1995. After the manway covers were removed and the usable oil in each tank was pumped out, approximately 7,000 gallons of sludge (the solids and sediments in oil) and an additional amount of a mixture of oil and water remained in each tank. Both Irvin and Michael Shiner knew that the tanks contained this sludge and oil/water mixture. Thomas Melin (a former BEC employee then employed by Alliance) informed Michael Shiner in April of 1995 that the manually-operated pump, which drains the accumulated water in the tank farm, needed to be operated to keep the tank CT Page 6534 farm from filling with water. Michael Shiner assured Thomas Melin that the pump would be turned on, but neither turned the pump on himself nor requested anyone else to do it after the manway covers were removed. Following heavy rains on April 21, 1996, the water level in the tank farm rose above the level of the open manways allowing approximately 20,000 gallons of oil/water mixture in the tanks to escape onto the water covered floor of the tank farm. Thomas Melin reported the release to DEP's OCSRD at approximately 8:45 a.m. on the day of the release. When the OCSRD staff arrived at the site at approximately 9:45 a.m., the water level in the tank farm was still above the level of the open manways.
The OCSRD, after consultations with Irvin Shiner at the site that morning, contacted a private environmental contractor, American Environmental Technology ("AET"), to clean up the site. AET arrived at the site by noon and under OCSRD's supervision removed over 90% of the liquid from the floor of the tank farm by the end of the day. The liquid removed included both water already inside the diked area of the tank farm and the oil/water mixture which had escaped from the tanks. The next day, AET removed the remaining liquid from the tank farm floor and began draining the pipes which led from the barge area to the tanks and from the tanks to the loading racks. Between April 23, 1996 and May 6, 1996, AET drained the remaining contents of the pipes and tanks and reinstalled the manway covers. Despite the removal of liquid from the diked area, oil stains remained on the inside of the dike wall indicating that the oil/water mixture had saturated the dike wall and had seeped into the soils within the tank farm. Neither AEC, the OCSRD, nor the plaintiffs analyzed the soils within or immediately outside the tank farm for potential contamination after the April 21, 1996 release, or undertook any remediation of the area after AET's cleanup.
Included in the findings of fact by the hearing officer and supported by substantial evidence in the record, including expert testimony, the following facts were developed respecting the consequence of the oil releases. Oil released onto an earthen floor will penetrate the ground and enter the subsurface soils. Once oil enters the subsurface soils it will travel downward and outward in an inverse conical pattern. Some of the released oil may become trapped between the soil surface and the water table, some of it may be absorbed by soil particles, some of it may reach the groundwater and flow downgradient to the receiving surface water body, and some of it may migrate through the CT Page 6535 groundwater to the underlying soil. Oil absorbed by subsurface soil particles or trapped among them will remain there until either it is chemically degraded by microorganisms or it evaporates.
Oil released directly into the subsurface soils will migrate underground in the same manner as an above-ground release that has entered the subsurface soils through an earthen surface. Once in the subsurface soils, an oil release will continue to spread outward and downward over time. The amount of oil in the soil, will decrease as a result of degradation and/or evaporation. Soil contamination from a more recent spills will tend to be more concentrated and localized than soil contaminated resulting from an older spill of an equivalent amount of oil released under similar conditions. In general, the greater amount of oil released, the larger the area of soil contamination which will result.
Oil discharged into a surface water body, such as the spring in the tank farm, will reach the water table faster, and thus travel further, than oil released onto dry ground. Oil spilled or leaked onto the ground in an area with high water table, such as the site, will also travel faster and further than a spill or leak in an area with a lower water table. Tidal influences, such as those at the site, can reverse groundwater flows. Oil released in a location subject to tidal influences will therefore have a more extensive and complicated pattern of soil contamination than a similar oil release in an area without tidal influences.
Water being denser than oil results in oil floating on the top of a water body if the water body is calm. However, oil does dissolve in water and that dissolution process begins immediately upon the release of the oil into the water. The more the water body is disturbed, the faster the oil will dissolve. Wind, tides and clean up activities will contribute to the dissolution of oil into the water.
A hydrogeologic investigation is the only way to determine the extent and nature of soil and water contamination at a site with a history of oil releases. The OSCRD received two reports of an oil sheen in the vicinity of the site on July 25, 1997. One of these reports was filed by an attorney representing BEC who indicated that BEC accepted financial responsibility for cleaning up the sheen. CT Page 6536
John Porter, a staff member of the OCSRD, arrived at the site on the morning of July 25, 1997 and observed that the bulkhead in the northeast corner of the site had partially collapsed and that water from the West River had entered the site behind the collapsed bulkhead and that an oil sheen comprising of less than ten gallons of oil had formed on both sides of the collapsed bulkhead. Shortly after John Porter arrived at the site, he was met by Irvin Shiner. Irvin Shiner then called Michael Shiner who arrived soon thereafter. After consulting with John Porter, Michael Shiner arranged for a private contractor to clean up the sheen. The OCSRD determined that the sheen resulted from contaminated soils behind the bulkhead coming into contact with the waters of the West River after the bulkhead collapsed. This determination was based on the location of the sheen, the newly exposed soils bordering that location, the absence of reports of other oil releases in the vicinity at that time, the outward direction of the tide at the time the OCSRD observed the sheen, the hydrogeologic conditions of the site, and the history of previous unremediated oil releases at the site.
The basis of the DEP authority to issue the order affirmed in the final decision is found in General Statutes § 22a-432. This statute provides that when the Commissioner of the DEP finds that "any person has established a facility or created a condition . . . or is maintaining any facility or condition which reasonably can be expected to create a source of pollution to the waters of the state, he may issue an order to such person to take the necessary steps to correct such potential source of pollution." Section 22a-432 is an environmental statute and, thus, shall be liberally construed to accomplish its purpose.Starr v. Commissioner of Environmental Protection, 226 Conn. 358,382 (1993). Section 22a-423 defines "pollution" as "harmful thermal effect or the contamination or rendering unclean or impure or prejudicial to public health of any waters of the state by reason of any wastes, or other material discharged or deposited therein by any public or private sewer or otherwise so as to directly or indirectly to come in contact with any waters." Section 22a-423 further defines "rendering unclean or impure" as "any alteration of the physical, chemical or biological properties of any of the waters of the state, including, but not limited to, change in odor, color, turbidity or taste." It is abundantly clear that a discharge of oil into water in a river or harbor would be direct "pollution"; and, the discharge of oil into soil would be an indirect source of "pollution" of the water. It is also evident that the statute is addressed not only CT Page 6537 at sources of pollution but specifically "potential" sources of pollution. Section 22a-432 refers both to "such potential source of pollution" and conditions "which reasonably can be expected to create a source of pollution." Section 22a-432 is entitled "Order to Correct Potential Sources of Pollution."
The plaintiffs' evidentiary claims are determined by the application of the substantial evidence rule. Substantial evidence in the record establishes a history of numerous oil spills directly into the water and into the soil at the site. Little, if any, remediation of the soil conditions was accomplished. The overwhelming evidence establishes that the site is in fact polluted and pollutes the water, and certainly establishes that the site represents a potential source of pollution of the water. The water potentially impacted by the oil in the soils of the site would include the underlying water table, the spring on the site, standing water in the diked area, the West River and New Haven Harbor.
The imposition of personal liability on the individual plaintiffs, Irvin and Michael Shiner, raise issues of first impression with respect to the application of Connecticut's Clean Water Act. The language of § 22a-432 authorizes the DEP Commissioner to issue an order to "any person" who has established a facility or created a condition or is maintaining a facility or condition which reasonably can be expected to create a source of pollution to the waters of the state. Section 22a-430
(d) provides that if the Commissioner finds that "any person . . . has initiated, created or originated or is maintaining any discharge into the waters of the state without a permit . . . he may issue an order to abate pollution. . . ." The act defines "person" as "any individual, partnership, association, firm, limited liability company, corporation or other entity . . . and any officer . . . of any partnership, association, firm or corporation." Section 22a-423.
The individual plaintiffs ignore the above referenced statutory provisions and argue that the DEP in seeking to impose personal liability on corporate officers is limited to the traditional tests for piercing the corporate veil. As a matter of law, this is simply not the case.
In Connecticut Building Wrecking Co. v. Carothers,218 Conn. 580, 595 (1991), our Supreme Court upheld the imposition of personal liability on the owners of a corporation which was CT Page 6538 improperly operating a solid waste facility by the dumping of materials. The Carothers case does not contain a discussion of the personal liability theory, but implicitly recognizes the appropriateness of the imposition of personal liability on corporate owners and/or officers under the environmental laws.
Personal liability for environmental violations is recognized under federal law. These cases do not involve or require a piercing the corporate veil analysis. See United States v.Northeastern Pharmaceutical Chemical Co., 810 F.2d 726, 744
(8thCir. 1986) ("NEPACCO"), cert. denied, 484 U.S. 848,108 S.Ct. 146, 98 L.Ed.2d 102 (1987); State of New York v. ShoreRealty Corp., 759 F.2d 1032, 1052 (2d Cir. 1985). In the NEPACCO
decision, the court specifically noted that personal liability in the environmental violation context is "distinct from the derivative liability that results from `piercing the corporate veil.'" NEPACCO, supra, 744. The decision distinguishes between piercing the corporate veil where the owner does not fully honor the corporate structure of the entity; from personal liability for environmental law violations which is premised on the personal involvement of the decision maker. In NEPACCO, the corporate president, a major share holder, was the individual in charge of and directly responsible for all of the company's operations and was personally liable for the transportation and disposition of hazardous substances though not personally involved in the actual specific decision. The plaintiffs argue that in NEPACCO the personal liability was based on the individual officer's personal participation in arranging the transportation disposal of the hazardous waste, but that was only the case with respect to one of the officers who had personally arranged for the transportation and disposal of the substances. An additional party, Edwin Michaels, was held personally liable even though he did not personally participate in the transportation and disposal of the particular hazardous waste at issue. Michael's liability was based on his role as the operator in charge of and directly responsible for all of NEPACO's operations. The court relied on the definition of "person" under the Resource Conservation and Recovery Act of 1976 ("RCRA"), which though not identical to the definition in the Connecticut environmental laws does include both individuals and corporations. See RCRA § 1004(15), 42 U.S.C. § 6903(15); see also Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") § 101(21), 42 U.S.C. § 9601
(21). CT Page 6539
In Federal Clean Water Act cases, personal liability against individual defendant corporate officers has been imposed on the basis of hands on control of the facilities activities, responsibilities for on-site management, contacts with regulatory bodies and involvement in decisions concerning environmental matters. See United States v. Gulf Park Water Co., 972 F. Sup. 1056,1064 (S.D. Miss. 1997); 33 U.S.C. § 1319(a)(1); UnitedStates v. Carolina Transformer Co., 739 F. Sup. 1030, 1037
(R.D.N.C. 1989), aff'd., 978 F.2d 832 (4th Cir. 1992).
In an environmental case, the Minnesota Supreme Court adopted the "responsible corporate officer" doctrine from United Statesv. Park, 421 U.S. 658, 672-73, 95 S.Ct. 1903, 1911-12,44 L.Ed.2d 489 (1975). In Matter of Dougherty, 482 N.W.2d 485 (Minn.App. 1992), the doctrine involves the requirement that three elements be established before individual liability will be imposed on a corporate officer: (1) the individual must be in a position of responsibility which allows the person to influence corporate policy or activity; (2) the existence of a nexus between the individual's position and the violation in question such that the individual could have influenced the corporate actions which constituted the violations; and (3) the individual's actions or inactions facilitated the violations. Matter of Dougherty, supra, 490.
The plaintiff, Irvin Shiner, was President and owner of the controlling stock of the plaintiff corporation and its predecessors since at least 1970. His father had created the business and he assumed his father's control and responsibilities. Former employees testified that no decisions were made at the site without Irvin Shiner's approval.
Irvin Shiner's position also has a nexus with respect to the violations in question. His complete control of the day-to-day operations of the site, his presence at the site five days a week since at least 1970 and his knowledge of the operations of the facility are connected to the history of repeated oil leaks and failure of soil remediation.[1]
Irvin Shiner's actions and inactions facilitated the violations, despite the repeated oil spills and leaks, there was no investigation or long term remediation at the site.
In the case of Michael Shiner, the facts also meet the responsible corporate officer test. Michael Shiner was the CT Page 6540 Vice-President and son of the President in a family owned business.Michael Shiner was typically working at the site and, since 1970, was responsible for environmental compliance. In this capacity, Michael Shiner communicated with the environmental agencies including the Federal Environmental Protection Agency, the Coast Guard and the DEP concerning environmental issues.
Michael Shiner's actions or inactions also facilitated the violations. No investigation of the impact of the spills or remediation of the soil contamination was initiated.
Michael and Irvin Shiner were both aware of unpermitted discharges from the loading rack to the waters of the state and failed to seek appropriate permits or to cease the discharges.
The Shiners have for fifty years operated a oil storage and distribution center which has repeatedly fouled the waters and soils of the state. They have sold off all the assets of their wholly owned corporation leaving only the polluted site which they apparently seek to continue and exploit through leasing arrangements with other companies. The obvious consequence of their efforts would be to leave the remediation effort and costs to the public expense. This is clearly not the intention of the environmental policy. This is a classic example of a situation in which individual liability is required.
The plaintiffs attack the hearing officer's procedure in allowing the hearing to be reopened on October 1, 1997 to hear evidence of the bulk head breach and oil stains on the water. Such evidence was certainly relevant to the issues before the hearing officer as to whether the soils on the site created a potential source of pollution of the waters of the state. The evidence proffered by the plaintiffs at the hearing with respect to their willingness to repair the bulk head breach was irrelevant to the issue of the potential pollution of the waters of the state caused by the oil in the soil and water on the site.
Accordingly, the final decision of the DEP is affirmed and the appeal is dismissed.
Robert F. McWeeny, J