WILSON, Judge.
This is an appeal by the plaintiff, Kirk Francis, from a final decision of the Office of Director of Regulations, the Director of Regulation (“Director”), revoking the Plaintiffs gaming license. As a result of the revocation of the gaming license, the Plaintiff was barred from the Mohegan reservation and consequently terminated from his position as a supervisor in the bingo department. This appeal is taking pursuant to Mohegan Tribal Ordinance (MTO) 95-6. The Court finds that the Plaintiff is aggrieved because of the termination of his position.
I. JURISDICTION
MTO 95-6 contains several provisions relevant to this appeal. Sec. 1(a) provides that the “Agency” includes the Office of the Director of Regulation as set forth in MTO 95-2; (b) provides that the “final decision” includes a final decision of the *461 Director regarding revocation of gaming licenses. Sec. 2(a) provides that “a person who is aggrieved by the final decision may appeal to the Gaming Disputes Court as provided in this ordinance.” MTO 95-2, Sec. 13, likewise provides for an appeal to this court from final decisions of the Director regarding revocation of gaming licenses. The Court therefore finds that it has jurisdiction to hear this appeal.
II. FACTUAL BACKGROUND
The Plaintiff filed this appeal on February 10, 2000, based on the revocation of his gaming license. This stemmed from a Decision by the Mohegan Tribal Gaming Decision dated January 10, 2000 based on an investigation that concluded that the Plaintiff misappropriated funds from the bingo operation. The Plaintiff appealed that decision to the Director of Regulations, and the Office of Director of Regulations held a hearing on January 19, 2000. At that hearing, evidence was produced that on December 13, 1999, the Plaintiff while in the course of his employment as the Supervisor of the Bingo Operation on occasion withdrew $1,000 to pay out prizes. However, there was a discrepancy of $400 that could not be accounted for. The Office of Director of Regulations reviewed an audio an video tape to see if there were more than $600 worth of door prizes called over the tape and the review of the tape showed that there were a total of $600 in door prizes, therefore leaving $400 unaccounted for. Based on this information, on January 24, 2000, the Office of Director of Regulations upheld the initial decision and this appeal followed.
Thereafter, the Plaintiff moved to submit additional evidence and testimony to the Court claiming that he was unable to present this evidence on his own behalf at the hearing held on January 19, 2000. The Court granted the Motion to Present Additional Evidence, but denied that portion of the motion that requested that the additional evidence be submitted to this Court. Rather, the matter was remanded to the Commission for a further hearing to receive the evidence that the Plaintiff desired to present.
The Defendant also moved to return to the Commission to submit additional evidence and testimony, which motion was granted by the Court.
Further hearings were held on November 28, 2000 and December 5, 2000. An extensive record was made of the latter hearings consisting, among other things, of a transcript of 364 pages.
The Court has reviewed the entire record, including the transcript.
As a result of the further hearings, the Commission upheld the exclusion and bar from the Mohegan Sun Casino and Reservation and the revocation of his gaming license. The Decision was dated February 9, 2001 and certified to the Plaintiff on February 12, 2001. The Commission made the following findings of fact:

FINDINGS OF FA CT

1. The MTGC’s decision to bar Mr. Kirk Francis was based upon an incident that occurred on December 13, 1999. On that date, Mr. Francis was working as a Floor Supervisor at the Mohegan Sun High Stakes Bingo.
2. On December 22, 1999, Mr. Don Sikorsky, Director of Bingo Operations was reviewing some paperwork for the December 13 session and noticed that $1,000 was requested for door prizes for that Bingo session which he considered an unusually high figure. Transcript of Hearing, pp. 14-15 (hereafter “Tr. -”.) Mr. Sikorsky contacted Bruce Eichelberg, Bingo Operations Manager, who was able to account for some of the money, but not $400. (Tr. *462 14-16). Mr. Eichelberg reviewed all of the paper receipts for that session and could not find receipts for $400. (Tr. 16-17).
3. At this point Mr. Sikorsky contacted the MTGC to investigate the matter. Brad Beecher, an investigator for the MTGC, prepared a report (Respondent’s Exhibit #2) and interviewed Mr. Francis and Barbara Lobacz, the Paymaster, about the unaccounted for funds on January 4, 2000. (Tr. 109-11). Mr. Francis had no specific explanation, but indicated it could have been door prize, some other matter or the paymaster could have been inexperienced. (Tr. 111-12). Ms. Lobacz told Mr. Beecher that Mr. Francis’ request for additional monies for bingo sessions was suspicious. (Commission Exhibit # 5, p. 13).
4. Thereafter Mr. Sikorsky wanted to make sure that there was not a missed bingo or other prize that would account for the $400, so he had Mr. Eichelberg review the audiotape of the December 13 session. (Tr. 32). The tape showed that $600 was given out a door prizes. (Tr. 32). In addition, Mr. Eichelberg reviewed all of the bingo Door Prize payout information from January 30, 1999 to December 28, 1999 and prepared a spreadsheet (Commission Exhibit # 1) showing all discrepancies between door prize payouts and paymaster receipts. (Tr. 13). The sheet showed that there were forty-one (41) discrepancies for sessions where Mr. Francis was Floor Supervisor. (Tr. 30). There was only one other discrepancy involving one other Floor Supervisor. (Tr. 60, 78, 317).
5. The MTGC’s decision to bar Mr. Francis was based upon all of the above information that indicted that Mr. Francis had misappropriated the $400 that was unaccounted for at the December 13 session.
6. Mr. Francis has now had two opportunities to present evidence in his defense of the MTGC’s claim that he misappropriated funds. The first was on January 19, 2000 at a hearing before the MTGC. The second was a hearing held on November 28, 2000 and December 6, 2000. Mr. Francis contends that he did not misappropriate any funds and that the $400 was paid to a Bingo patron on December 13, 1999 for a “missed Bingo”. Mr. Francis claims that there is no receipt or other paperwork accounting for the missed Bingo because there were no Internal Controls or other procedures that required Floor Supervisors to obtain receipts. Furthermore, he disputes the claim that the missed Bingo would have been seen on the audiotape of the December 13 session. These claims will be addressed below.
7. It is clear that Mr. Francis bases his defense on a missed Bingo. In his direct testimony at the November 28, 2000 hearing he stated: “I know specifically on that date that I did have a missed Bingo. And it was a $400 payout.” (Tr, 128). He testified that he was “99 percent sure that it was on the 9-Block Special that day ...” (Tr. 128). On cross-examination he again insisted that he was positive the $400 was for a missed Bingo. (Tr. 151). When Mr. Francis was recalled at the hearing, he testified that he drew out the $400 after the missed Bingo that he said was the “block of 9 special”. (Tr. 342). He continued to insist that the $400 was for a missed Bingo. (Tr. 353-55).
8. Substantial, credible evidence shows, however, that there was no $400 missed Bingo on December 13 that would account for the misappropriated funds.
9. Four witnesses testified that a missed Bingo would have been detected by a review of the audiotape of the session. Mr. Sikorsky (Tr. 11-12, 32, 327); Mr. Eichelberg (Tr. 76, 98, 107); Sandra Hau- *463 ser, a Floor Supervisor who worked with Kirk Francis (Tr. 275-77, 283); and Michelle Occhialini, another Floor Supervisor (Tr. 315). Two of the witnesses, Ms. Hau-ser and Ms. Occhialini, were called by Mr. Francis’ attorney. In fact, it appears that review of the audiotape is standard operating procedure for verifying a missed Bingo. This is shown in the following exchange between Michael Jewel (M.J.) And Michelle Occhialini (M.).
M.J.: How do you reconcile monies that you give away for a missed Bingo to the patron who claims they yelled Bingo and didn’t get paid?
M.O.: No, I know that they would take the card, the Bingo card, bring it upstairs, go over, review the call, make sure whether or not the numbers had actually been called, review the tape and the sheet, I know that.
(Tr. 315).
10. Bruce Eichelberg testified that he reviewed the tape and confirmed that all that was shown was $600 in door prizes and no missed bingo to account for the missing $400. (Tr. 76). The audiotape has been introduced as evidence n this proceeding, has been available to Mr. Fi'aneis and his attorney, and no one has argued that the tape shows a $400 missed Bingo.
11. Mr. Francis testified that a $400 missed Bingo would not necessarily be detected on an audiotape. He stated that “it’s just absurd to think that these missed Bingos are recorded on that audio tape”. (Tr. 342). He disagreed with Sandra Hau-ser’s testimony that a missed Bingo would show up on the tape. (Tr. 356). However, Mr. Francis also appeared to contradict his testimony when he tried to explain the timing of his request of the $400 for the missed Bingo. He stated: “I requested the missed Bingo at 12:04 because as its been testified to, you know, we have to go upstairs, review the tape, all these things.” (Tr. 346). This statement directly conflicts with his testimony that it would be absurd that a missed Bingo would be detected on an audiotape.
12. In addition, there is no record or other documentation of a $400 missed Bingo on December 13. The record of what occurred at the Bingo session is shown on four documents: the Paymaster, Barbara Lobacz’s, Detailed Balance Sheet (Respondent’s Exhibit # 2); the Bingo Prize Payout Sheet (Respondent’s Exhibit # 1); Door Prize Receipts (Respondent’s Exhibit # 2). The Paymaster’s Balance and Payout sheets show only one $400 transaction, a door prize payout of $400 for game 306 which is accounted for as a “mystery envelope” game. (Tr. 15). The receipts do not show a payment for a missed Bingo.
13. Mr. Francis explanation that the $400 was for a missed Bingo for the Block of Nine game is not credible. Mr. Francis explains that $400 of the $1,000 drawn at 11:16 a.m. is for a missed bingo. He mentions it to Miss Lobacz, Paymaster, when he requested the transaction: “... she [Paymaster Barbara Lobacz] even writes on the slip six $100’s, then she writes four $100’s which is exactly how I requested it and mentioned the missed bingo to Miss Lobacz.” (Tr. 128-129). Respondent’s Exhibit # 2 indicates that he missed bingo Mr. Francis claims to have paid with the $400 is the nine block special, which occurred at 11:29 a.m. It is difficult to believe that at 11:16 a.m., when the $1,000 transaction occurred, that there would be a missed bingo at 11:29 a.m. causing Mr. Francis to request the money up front. Another nine block special was played later that day (2:24 p.m,), but the payout, if it were a missed bingo, would have been only $250. Mr. Francis then contradicts his testimony when he states that “... the *464 $400 that was requested at 12:04 p.m. was for the missed bingo on 11:29 like I testified to the other day.” (Tr. 344). The Paymaster’s Balance and Payout sheets only show one $400 transaction, a door prize payout of $400 for game 306 which is accounted for as a “mystery envelope” game. (Tr. 15). The receipts do no show a payment for a missed Bingo.
14. There was considerable testimony by both parties about the Bingo operation’s Internal Control and the receipts that were or were not required for different payouts, including missed Bingos. Commission witnesses testified that Internal Controls were in place and all Floor Supervisors were required to obtain receipts from Bingo patrons for all prizes (door prizes, wheel spins, travel money, promotional giveaways and missed Bin-gos). Sikorsky (Tr. 3-11, 46-52); and Ei-ehelberg (Tr, 66, 85-87); and Beecher (Tr. 113). Respondent witnesses testified that they were generally aware of the Internal Controls but they were never required to obtain receipts from patrons for anything other than a regular Bingo or a door prize. Francis (Tr. 126, 131, 142-148); Wilson (Tr. 182-83, 192, 196-97); Hauser (Tr. 259-62); and Blais (Tr. 295).
15. In essence Mr. Francis’ argument is that prize money was flowing everywhere on the Bingo floor, some of it to “create excitement”, and it is not possible to account for this money, including the $400 in question.
16. The problem is that even if there was a defect in Bingo Internal Controls, and no one was getting receipts, that still does not account for the $400 Mr. Francis claims was used for a missed Bingo. The existence of a receipt for the missed Bingo would exculpate Mr. Francis, but the lack of receipt does not help his case. The fact remains that Mr. Francis’ story is that it was a missed Bingo, not a wheel spin, travel money or other promotional game. The missed Bingo would be verified by a review of the audiotape.
17. In Mr. Francis’ testimony, he claims he was never given a copy of the internal controls, contrary to the information in Commission Exhibit # 6 asking Floor Supervisors for comments on the revised internal controls. If Mr. Francis had not received the internal controls as indicated in the message, then he should have requested another copy from his supervisor. However, during his first hearing on January 19, 2000 he indicates (Commission Exhibit # 5, page 16) that “I’ve never seen anything in existence in our Policies and Procedures on how to do that [missed bingo].” This statement leads this Hearing Officer to believe he has worked with Mohegan Sun High States Bingo Internal Controls.
18. The Personnel File for Mr. Francis (respondent’s Exhibit # 5) shows that during a job interview with Don Sikorsky, Mr. Francis explained he put together a policy and procedure manual and received approval from management. He also stated in his testimony that he signed for internal controls when employed at Foxwoods (Tr. 148). A prudent and responsible person with twelve to fourteen years of bingo experience as Mr. Francis has should have asked for the Mohegan Sun High Stakes Bingo Internal Controls.
19. The Respondent’s attorney’s objection to the presentation of the August 22, 1999 bingo videotape is upheld. The tape should have been introduced as part of the discovery process. Testimony by Sandra Hauser relating to the tape and its contents are excluded.
20. From the facts stated above, it is clear that Mr. Francis, a supervisor of the Mohegan Sun High Stakes Bingo, owed his employer a duty of care in the supervision *465 and accounting for cash funds which were in his care, custody and control. The evidence supports a finding of a dereliction of duty and that poses a clear and present threat to the integrity of the gaming activities of the Tribe.
21. Mr. Francis’ exclusion and bar from the Mohegan Sun Casino and Reservation are upheld and the revocation of his gaming license remains in effect.
Thereafter, the Plaintiff filed an Amended Appeal from the Decision of February 9, 2001.
The matter was thereafter fully briefed by counsel for both parties and came before the Court for oral argument on June 7, 2001.
III. LEGAL STANDARD OF REVIEW
An appeal to this court from a revocation of a license is governed, inter alia, by MTO 95-6. In accordance with Sec. 2(g) a transcript of the hearing held by the Director was made a part of the record of this case, as were other documents in the record, including the agency’s findings of fact and conclusions of law. Oral arguments and written briefs were received.
Under subsection (i) the appeal is confined to the record as thus established. Under subsection (j):
(j) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or dearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment.
The standard set forth in Sec. 2(j) of MTO 95-6 is substantially the same as that set forth in the Connecticut Administrative Procedures Act, Conn.Gen.Stat. Sec. 4 — 183(j); therefore, Connecticut cases interpreting Sec. 4-183 are instructive. Under this standard, in an administrative appeal from the revocation of a license, the plaintiff bears the burden of proving that the director’s decision to revoke a license was clearly erroneous in view of the reliable, probative and substantial evidence on the whole record, cf. Bialowas v. Commissioner of Motor Vehicles, 44 Conn.App. 702, 708-709, 692 A.2d 834 (1997):
Judicial review of an administrative agency decision requires a court to determine -whether there is substantial evidence in the administrative record to support the agency’s findings of basic fact and whether the conclusions drawn from those facts are reasonable ... Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. The evidence must be substantial enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. If the administrative record provides substantial evidence upon which the hearing officer could reason *466 ably have based his finding ... the decision must be upheld. Bialawas v. Commissioner of Motor Vehicles, 44 Conn.App. at 709 (internal quotation marks and citations omitted).
Also applicable is MTO 95-2, An Ordinance Establishing the Mohegan Tribal Gaming Authority (MTGA), which grants the MTGA the power over licensing and vests in the Director the duty of “issuing and revoking licenses and generally overseeing the integrity of the gaming operation.” Sec. 5(b)(10). See. 12(5) provides that the Director “shall carry out the Tribe’s regulatory duties as described in ‘MTO 94-1’ and vests in the Director final authority over all license applications.”
MTO 94-1, the “Mohegan Tribal Gaming Ordinance”, incorporates the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. Secs. 2701 et seq., and sets forth in Sec. 9 qualifications for gaming licenses. One of the purposes is to protect against “threats to the public interest, or the interest of the Tribe or to the effective regulation and control of gaming.” See 25 U.S.C. Sec. 2710(b)(2)(F)(ii)(II).
IV. REVIEW OF THE DEFENDANT’S ORDER
The Defendant’s Order was based on a discovery of a shortage of $400 occurring on the Plaintiff s tour of duty on December 13, 1999. As the Defendant reconstructed the events, there was a difference of $400 found in the paperwork on that matter. The Plaintiff claimed that the $400 was paid out for a missed Bingo. A missed Bingo is where a patron’s call of Bingo was not heard by the caller or the floor worker and the bingo game was played on to another winner. If the patron who initially called out Bingo was not heard, and complains that he or she had called Bingo, the floor workers and supervisor investigate the situation. They interview the patron and the floor worker, check the cards against the numbers that had been called, and review the audiotape to determine if, in fact, a Bingo was called. As noted in the Findings of Fact and the Decision of the Commission, four witnesses testified that a missed Bingo would have been detected by a review of the audiotape session, and the person investigating did not confirm that with a review of the audiotape.
The Plaintiff claimed that an audiotape would not necessarily have picked up a missed Bingo. While this may be true, there was substantial evidence before the Commission that a missed Bingo would be picked up on the audiotape, and that a review of the tape did not disclose that there was any missed Bingo.
It is not the function of this Court to gauge the credibility of witnesses or the strength of the evidence before the Commission. Whether this Court would reach the same conclusion upon a review of the evidence is not material.
Rather, this Court must uphold the Decision if there was substantial evidence.
Briggs v. State Employees Retirement Commission, 210 Conn. 214, 217, 554 A.2d 292 (1989);
Newtown v. Keeney, 234 Conn. 312, 319, 661 A.2d 589 (1995); and,
Connecticut Building Wrecking Company v. Carothers, 218 Conn. 580, 593, 590 A.2d 447 (1991).
Based on this standard of review, the Court finds that there is substantial evidence in the record to support the finding of the Defendant. This Court cannot substitute its judgment for that of the Defendant as to the weight of the evidence on questions of fact. MTO 95-6 Sec. 2Q). Nor is this Court permitted to substitute its discretion for that of the Defendant. *467 The Defendant concluded that the revocation of the license was warranted to preserve the integrity of the gaming enterprise. This was within the discretion of the Defendant who has the duty of issuing and revoking licenses and overseeing the integrity of the gaming operation. He has final authority over all license applications. Based on the record, this Court cannot hold that this was an abuse of discretion or a clearly unwarranted exercise of discretion. See Department of Public Safety v. Freedom of Information Commission, 51 Conn.App. 100, 104, 720 A.2d 268 (1998).
Therefore, the appeal is dismissed without costs.